Russell COLLINS, Jr.

v.

Parker L. HANCOCK, Warden, New Hampshire State Prison, et al.

Russell COLLINS, Jr.

v.

Joseph VITEK, Warden of the New Hampshire State Prison, and State of New Hampshire.

Civ. A. Nos. 72–114, 73–8.

United States District Court,
D. New Hampshire.

Feb. 23, 1973.

**1254**

Richard Cotton, New Hampshire Legal Assistance, Concord, N. H., for plaintiff.

Robert V. Johnson, II, Asst. Atty. Gen., for the State of New Hampshire.

## OPINION

BOWNES, District Judge.

These are two civil rights actions instituted by the same petitioner who is confined in the New Hampshire State Prison. Since essentially the same issues are raised in both petitions, they were consolidated for hearing and both cases are treated as one in this opinion. Jurisdiction is based on 28 U.S.C. § 1343(3) and (4) which provides for original jurisdiction of the Federal Courts in all suits brought pursuant to 42 U.S.C. § 1983. The petition also asks for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

There was a hearing on February 7, 1973. The petitioner was represented by court-appointed counsel, Richard Cotton, and I wish to thank him for his voluntary participation in this case.

There are two issues before the court:

1. Whether or not the prison administrative procedure by which the petitioner was put in solitary confinement for thirty days and at a subsequent date placed in punitive segregation violated his constitutional right to due process of law; and

2. Whether or not the punishment imposed violated the Eighth Amendment constitutional guarantee against cruel and unusual punishment.

## THE FACTS

*A. Collins' Alleged Conduct and His Punishment*

Petitioner started his prison term of not more than twenty years nor less than fourteen years on December 9, 1970. He had been found guilty by a jury of the offense of assault with intent to murder a policeman. He was

also found guilty of unlawful possession of narcotics with intent to sell for which he received a suspended sentence of not more than ten years nor less than a year and a day in State Prison. Pursuant to NH RSA 607:9, the petitioner was also sentenced to serve fifteen days per year in solitary confinement in the years 1971, 1972, and 1973, for a total of forty-five days.

The petitioner's record is not a pretty one. It includes reckless operation of a motor vehicle with death resulting, robbery and assault, possession of a dangerous weapon, possession of narcotics, and unlawfully carrying a firearm. (Ex. A).

On the evening of August 6, 1971, an inmate, Staples, was stabbed several times in the abdomen with an ice pick or similar weapon. Some of the other inmates present assaulted Collins in the belief that he had done the stabbing. As many as fifty inmates threatened Collins and a prison guard took Collins to the hospital cell of the prison for his own protection. Collins' cheekbone and eye had been cut but, due to the quick action of Officer Thornton, he was not injured seriously. Warden Hancock talked to Collins in the hospital cell mainly in an effort to find out what kind of a weapon had been used so the doctors treating Staples at the hospital could know what was involved. Collins was put in solitary confinement that night and remained in solitary for thirty days. There was no hearing prior to the solitary confinement. Warden Hancock was concerned about what Collins might do to other prisoners and what they might do to him. After serving thirty days in solitary, Collins was transferred to the segregation section of the prison. Warden Hancock informed Collins on more than one occasion why he was in solitary and why he was kept in segregation. Collins remained in segregation until September 15, 1972.

No written punishment procedures were in effect on August 6, 1971. The unwritten procedure usually followed was that a written complaint was made by someone having personal knowledge of what happened and the prisoner was then brought before the Prison Disciplinary Board consisting of the Warden, the Deputy Warden, and one other prison official. The complaint was read to the inmate who had a chance to answer it. Complaints were usually disposed of in one day. Even this unwritten procedure was not accorded Collins. State criminal charges are now pending against Collins as a result of the incident of August 6, 1971.

On November 7 or 8, 1972, Warden Vitek, who had succeeded Warden Hancock after his retirement on September 1, 1972, learned that an inmate, Underhill, had been assaulted by another inmate. Underhill was bruised in the back of his neck. An investigation was made and statements taken from witnesses. Collins was identified by Underhill and several other inmates as the perpetrator of the assault. A hearing was held before the Prison Disciplinary Board consisting of the Warden and four other prison officials on November 8th. Both the Warden and one of the members of the Board, Officer Geary, had actively participated in the investigation. The investigation report was read to Collins, but he refused to deny or confirm it. No notice was given to Collins prior to the hearing. The Disciplinary Board felt that Collins presented a real danger of physical harm to the other prisoners. He had been overheard threatening an inmate with a "boat ride," which is prison slang for death, and he allegedly threatened to cut or bite off the finger of an inmate on which there was a ring that Collins coveted. Collins was transferred indefinitely to punitive segregation after the hearing and is still in punitive segregation. He has never received a written report of the decision nor has he been told how long he will remain in segregation.

Under Warden Vitek, a prisoner is allowed to state his case before the Disciplinary Board and a request for additional time to prepare for the hearing is customarily granted.

Dr. Henry Payson, a psychiatrist who is now working on a program relative to disturbed offenders at the prison, has interviewed Collins eight or nine times since July of 1972. After his initial interview, Dr. Payson made a tentative diagnosis that Collins had a sociopathic personality, was paranoid, had poor impulse control, and was impelled to commit aggressive acts. This diagnosis has now been discarded and the doctor has no diagnosis to offer at the present time. Dr. Payson testified that Collins is a very sensitive individual, is not paranoid or sociopathic, has a poor ability to assess and appraise reality, has a higher than normal intelligence, and is definitely not normal. The doctor stated frankly that he does not know what is wrong with Collins, but that he has an inexplicable trait of indulging in acts that are extremely harmful to him and self-defeating in the long run. Dr. Payson was quite definite in stating that segregation was harmful to Collins and that more than likely would result in more aggressive acts upon his release. He also made the obvious observation that indefinite punishment has an adverse psychological impact and is much worse than a definite sentence. According to Warden Hancock, Collins is amenable and easy to get along with ninety percent of the time, but five percent of the time he is dangerous, violent, and disruptive. The Warden's observation was basically the same as that of the psychiatrist. It is fair to conclude that Dr. Payson's observation of Collins gives little hope of effective psychiatric treatment, at least at this time.

Collins makes no claim of physical abuse by any of the prison officials. He has suffered no loss of mandatory or earned good time.

### B. The Punishment Involved

The general prison population is allowed to exercise twice a day and works regularly at prison assigned jobs. Movies are shown once a week and a prisoner is allowed full use of the prison library. Visitors can been seen at regular times. Prisoners are allowed to pursue a hobby. Collins' hobby was leather working and he sold his products through the prison hobby shop.

Punitive segregation severely limits a prisoner's life. He is confined to a cell 6' x 8' for twenty-three and one-half hours per day. For the remaining thirty minutes, the segregated inmate may walk in the corridor outside of the cell which is 8' wide and 66' long. The cell has a bed, a sink with hot and cold water, and a toilet. The prisoner is allowed a tooth brush. Showers are permitted on a daily basis. A segregated prisoner is allowed a radio in his cell and can use a typewriter by special appointment for legal matters. He gets the same food as the general prison population. Visiting privileges are not curtailed and mail is allowed under the same conditions as in the main prison.

Solitary confinement is the ultimate in prison punishment. A prisoner sentenced to solitary is confined in a cell 6' x 8' x 8' twenty-four hours a day. There is no light in the cell. The only source of light is from a bulb in the corridor outside of the cell door. The inmate is allowed one set of underwear as clothing. He is furnished two blankets. A mattress is put in the cell at 3:45 P. M. and removed at 8:00 A.M. No tooth brush is allowed. While in solitary, a prisoner receives no mail and is not allowed books or any reading material. The diet is restricted to four slices of bread for breakfast and lunch and a full meal for dinner with milk. No coffee or desert is allowed, but the inmate is allowed all the water he wants. The solitary cell or "hole" as the prisoners call it, is inspected at least three times a day by supervisory personnel. Under New Hampshire law, solitary confinement cannot exceed thirty days at one time. NH RSA 622:14.

### FINDINGS

From the foregoing facts, five basic findings are made:

1. The prison officials had reasonable grounds for believing that Collins

had inflicted serious bodily harm on one inmate and at least attempted violence against another.

2. Given Collins' record, both in and out of prison, Warden Vitek's conclusion that the presence of Collins in the general prison population posed the continuing danger of physical harm to the other inmates was not unfounded or unreasonable.

3. The imposition of punitive segregation or solitary confinement for an extended period of time is severe punishment.

4. Collins did not receive even the rudiments of the constitutional guarantees of due process of law before he was summarily punished.

■ 5. The written (Ex. 4) and unwritten procedures followed before the imposition of punishment do not approach the basic constitutional requirements of due process.

■ I also find that punitive segregation, so long as it is for a fixed period of time, does not constitute cruel and unusual punishment.

■■ I make no finding one way or the other as to whether solitary confinement under the conditions described constitute cruel and unusual punishment because the issue is now moot as to the petitioner and was not fully explored at the hearing. I note only that the definition of what constitutes cruel and unusual punishment is a constantly expanding one. Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y.1970); Knuckles v. Prasse, Washington v. Brierly, 302 F. Supp. 1036 (E.D.Pa.1969); Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn. 1969); Jordan v. Fitzharris, 257 F. Supp. 674 (M.D.Cal.1966).

## THE LAW

The civil rights explosion that started with Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), is now having its impact on the jails and prisons of our society. The emerging rights of the confined is another example of the extension of the mantle of constitutional protection to individuals who, except for a compassionate few, were a few short years ago thought to be beyond the pale of the Bill of Rights by the courts as well as society in general.

■ It is now firmly established that prisoners are entitled to due process of law before severe prison punishment can be imposed. Justice Blackmun in Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968), stated:

. . . a prisoner . . . does not lose all of his civil rights during and because of his incarceration. In particular, he continues to be protected by the due process and equal protection clauses which follow him through the prison doors. At page 576.

So also, the First Circuit has indicated that basic guarantees of fairness must precede punishment:

While all the procedural safeguards provided citizens charged with a crime obviously cannot and need not be provided to prison inmates charged with violation of a prison disciplinary rule, some assurances of elemental fairness are essential when substantial individual interests are at stake. Nolan v. Scafati, 430 F.2d 548, 550 (1st Cir. 1970).

In Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971), the Second Circuit held that prisoners were entitled to due process before punishment.

Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1969), has already become one of the landmark cases in the due process area. The following language is pertinent:

Accordingly, as we said in Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230 (1961), "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private

interest that has been affected by governmental action." At page 263, 90 S.Ct. at page 1018.

I now turn to the task of determining the procedures that due process require in the circumstances of the New Hampshire State Prison. The government function involved is the security of the general prison population against which must be measured the constitutional right to some sort of due process hearing before severe punishment can be meted out to an individual prisoner. Fortunately for me, other district judges have faced the same task and I draw heavily on their efforts. Judge Pettine in Morris v. Travisono, 310 F.Supp. 857 (D.C.R.I.1970), wrote a monumental decision that meaningfully brought the essential protection of due process into the Rhode Island prison system. In Clutchette v. Procunier, 328 F.Supp. 767 (N. D.Cal.1971), Judge Zirpoli carefully delineated procedural due process requirements for the San Quentin Prison in California. Out of the Eastern District of Virginia has come Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), which enunciated basic due process rules for state prisoners. Perhaps the longest and most complete treatment of the prison due process requirements is the recent case of Sands v. Wainwright, decided January 5, 1973 (M.D.Fla.). In that opinion Judge Scott made an exhaustive and complete review of all the pertinent authority in the field and fashioned a decree that is both fair and workable.[1]

All of the cited cases are in agreement that prison due process requires as a minimum the following:

1. The decision to punish must be made by an impartial tribunal.

2. A hearing must be given the accused with sufficient advance written notice of the charges so that he will be able to prepare for the hearing, and the accused must be given an opportunity to confront and cross-examine witnesses and call witnesses on his own behalf.

3. The decision rendered must be in writing and based on substantial evidence presented at the hearing.

At the hearing on this case, Warden Vitek alluded to the extra burden that full blown due process requirements would impose on his staff. Judges have some knowledge of the problems facing prison officials and have no desire to add to them, but the guarantees of the Bill of Rights cannot be ignored, evaded, or even blunted for the sake of administrative efficiency or because of fiscal deficiencies. I realize that prison discipline must at times, be quick to be effective and I have no desire to tie the hands of prison officials when speedy action is necessary.

## SUGGESTED PRISON DUE PROCESS REQUIREMENTS

This is not a class action so I cannot enter an order that will be binding on the defendant Vitek except as to the petitioner. Since, however, it is probable that other cases will be brought in this court addressed to the same issue, it is my opinion that the following due process standards will withstand constitutional attack.

■ I. Where severe punishment may be imposed, i. e., solitary confinement for more than five days, punitive segregation for more than fifteen days, or loss of more than thirty days good time, due process requires:

A. A hearing before an impartial tribunal. This means that a prison offi-

---

[1]. See also Krause v. Schmidt, 341 F.Supp. 1001 (W.D.Wisc.1972), United States ex rel. Walker v. Mancusi, 338 F.Supp. 311 (W.D.N.Y.1971), United States ex rel. Robinson v. Mancusi, 340 F.Supp. 662 (W.D.N.Y.1972). I also note the recent decisions out of the District Courts of Rhode Island and Massachusetts holding

that due process requirements of notice and hearing must be afforded prisoners before they can be transferred to another penal institution. Gomes v. Travisono, 353 F.Supp. 457, decided Jan. 16, 1973 (D.C.R.I.); Barrett v. Boone, decided Jan. 26, 1973 (D.C.Mass.).

cial who has participated in the investigation of the offense cannot be a member of the hearing tribunal. Since New Hampshire is a small prison by national standards, the Warden and Deputy Warden are, of necessity, involved in the day to day operation of the prison and have a working familiarity with both guards and prisoners. The impartial tribunal, therefore, should have at least one member who is not a prison official. Such member could come from either the Board of Prison Trustees or the Parole Board. This is a matter for the Warden and the Prison Trustees to work out.

B. A written notice of the hearing containing the charges in detail should be given to the accused at least five days prior to the hearing.

C. At the hearing the accused should have the right to set forth his position, call witnesses on his own behalf, and confront and cross-examine all witnesses.

D. A record of the hearing should be made. This does not mean a stenographic record. A tape recording is sufficient.

E. The decision rendered should be in writing, it should set forth the reasons for the punishment imposed, and it must be based on substantial evidence.

F. The accused does not have an absolute right to counsel, except that if the offense constitutes a felony under the criminal laws of the State of New Hampshire, then counsel must be furnished. In any event, the testimony of the accused should not be used against him in any subsequent criminal proceeding.

G. Any sentence imposed should be for a fixed period of time.

H. There should be review, if the accused requests it, of the decision. It is my opinion that such review should be by the Board of Trustees or the State Parole Board or a combination of both. The reviewing panel should consist of not less than three members.

II. For any punishment of a lesser severity, including loss of good time, loss of privileges, but not including confinement in solitary for less than two days (48 hours), or punitive segregation for less than three days (72 hours), due process requires:

A. The prisoner should be informed in writing of the offense charged at least twenty-four hours prior to the hearing.

B. If the prisoner waives a hearing, he may do so in writing on the notification form.

C. A hearing should be held before the Prison Disciplinary Board not sooner than twenty-four hours after the notification.

D. The Disciplinary Board should be composed of appropriate prison officials, but shall not include anyone who has participated in the investigation of the incident giving rise to the charges.

E. The accused should have the right to produce witnesses in his own behalf and confront and cross-examine other witnesses.

F. No record need be kept of the hearing.

G. Counsel need not be furnished.

H. Review would not be required.

Nothing in the aforementioned due process requirements should prevent the prison officials from confining an inmate in punitive segregation pending a hearing if it is reasonably believed that his presence in the general prison population constitutes a threat to other prisoners, prison security, or danger of physical harm to himself.

## ORDER

Since the petitioner was deprived of his constitutional right to due process of law, it is ordered that he be forthwith released from punitive segregation.

If any further charges are brought against him, the due process requirements as set forth herein shall be followed.

# 1260

Both the petitioner and prison officials are advised that I have suggested no limit to the length of punitive segregation, except that the term be a definite one. If the accused is found guilty of committing another assault while in prison, after a hearing that comports with constitutional due process requirements, then a lengthy sentence of punitive segregation, even extending to the balance of the petitioner's prison term, would not violate the petitioner's constitutional rights.

The petitioner's claim for damages is denied.

This opinion shall not be made public until after the petitioner is tried or pleads guilty to the pending criminal charges against him.

So ordered.