George **NIEVES** et al., Plaintiffs-Appellants,

v.

Russell G. **OSWALD,** Commissioner of Correctional Services, Vincent R. Mancusi, Superintendent of Attica Correctional Facility, Defendants-Appellants.

No. 1077, Docket 73–1846.

United States Court of Appeals, Second Circuit.

Argued July 19, 1973.

Decided Jan. 30, 1974.

On Rehearing May 31, 1974.

Herman Schwartz, Buffalo, N. Y. (Edward I. Koren, ACLU Prison Rights Project, Buffalo, N. Y., Kenneth Kimerling, National Lawyers Guild, William E. Hellerstein, Legal Aid Society of New York, Morton Stavis, Stanley A. Bass, New York City, on the brief), for plaintiffs-appellants.

John H. Stenger, Sp. Asst. Atty. Gen. Louis J. Lefkowitz, Atty. Gen., for defendants-appellants.

Before MOORE and OAKES, Circuit Judges, and TYLER,* District Judge.

MOORE, Circuit Judge:

Between September 9 and 13, 1971, a disturbance by the inmates at the Attica Correctional Facility (Attica) resulted in many acts of violence and many deaths. A not unexpected aftermath has been an attempt to ascertain, both inside and outside prison walls, such persons as might have been responsible. Outside the prison a special grand jury was impaneled to consider possible criminal charges; inside the walls there remains the possibility of disciplinary hearings against inmates who took part in the disturbance.

Anticipating criminal and/or disciplinary action against them, nine [1] inmates, purporting to sue on behalf of all inmates of Attica subject to disciplinary hearings as a result of the events at Attica between September 9th and 13th, filed a complaint on November 16, 1971,[2] seeking injunctive relief against the holding of such hearings on the ground that adequate procedural safeguards had not been provided. A "declaration that the facts complained of are unconstitutional" was also sought.

Plaintiffs-appellants (as Petitioners) asked that a three-judge court be convened. This request was denied; on appeal the denial was reversed by this court and remanded, Nieves v. Oswald, 477 F.2d 1109 (2d Cir. 1973). On remand plaintiffs withdrew their request for an injunction. This left only the declaratory issue for the District Court's determination.

The District Court carefully considered each contention raised by plaintiffs, namely, (1) fear of self-incrimination in connection with matters pending before the special grand jury; (2) inability to be present to confront and cross-examine witnesses; (3) failure to require testimony under oath; (4) no opportunity to present evidence in own behalf; (5) lack of counsel or counsel substitute; (6) failure to provide an impartial tribunal; and (7) failure to provide for a written decision based upon substantial evidence. More specifically, the Court also dealt with charges that the rule allegedly violated was not made known to the inmate, that the rules were too general and vague, and that copies of the rules were not given to inmates.

The Court then proceeded to analyze the Rules (in order as they appear in the District Court's opinion, §§ 251.5, 252, 253, 253.2, 253.3, 253.4, 253.5, 270.2, 270.4, 260.4, 261, and 261.3). 7 N.Y.S. C.R.R. Chap. V.

In a rather lengthy opinion the trial court held, in substance, that to protect the inmate against self-incrimination which might arise in any disciplinary hearing, the inmate should have (1) an adequate opportunity to consult counsel prior to the proceeding; (2) a prison employee to assist the inmate designated pursuant to section 253.2 of the New York State Code of Rules and Regulations (N.Y.S.C.R.R.), Chapter V, Volume 7; (3) presence of counsel at the initial meeting between inmate and the desig-

---

* Hon. Harold R. Tyler, Jr., of the Southern District of New York, sitting by designation.

1. By amendment dated November 23, 1971, eight other plaintiffs were added.

2. Nieves was the only plaintiff filing on this date.

nated employee to discuss and determine investigatory procedures; (4) a copy of the employee's written investigation report; and (5) counsel present during the hearing to consult with the inmate. The Court limited these safeguards by declaring that such counsel was not to have leave to "conduct his own personal investigation within the confines of the prison" or "to cross-examine witnesses nor to call witnesses in addition to those interviewed by the hearing officer."

In short, the Court held that: "To condone a procedure whereby an inmate goes into those proceedings uninformed or ill advised as to the dangers involved, then makes an incriminating statement and is left with the sole remedy of a pretrial suppression hearing, appears to this Court to be inconsistent with the requirements of due process when received in the context of the present situation." Having satisfied itself that counsel was required, the Court granted the right, subject to certain limitations. The trial Court concluded that the "defendants are permanently enjoined from conducting any and all disciplinary hearings concerning charges against inmates arising from their claimed participation in the events at Attica between September 9 through 13, 1971, inclusive, unless and until such inmates are provided the assistance of retained or appointed counsel to act in the capacity detailed in this opinion." The Court, noting our *en banc* decision in Sostre v. McGinnis, 442 F.2d 178 (2d Cir.), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1971), 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), qualifies its opinion with the caveat that it "should not be considered as holding that the right to counsel is required in all cases of prison disciplinary proceedings."

The case now comes to us on appeal both by plaintiffs who inveigh against the limitations placed by the trial court on the "due process safeguards" that were granted and by defendants who object to that portion of the court's opinion which grants the prisoners the assistance of counsel.

Because it is not known at this time what, if any, charges may be leveled against these particular inmates, the District Court's opinion must, of necessity, have been somewhat hypothetical in character. The Court stated:

Although the services thus provided may afford the inmate an alternative means of establishing a defense to the disciplinary charge, it does little to protect him from self-incrimination, either through ignorance or otherwise, as far as possible criminal charges of murder, kidnaping and the like which may flow from his involvement in the September revolt.

During the course of those disciplinary hearings, there must certainly come a time when a determination has to be made concerning what statements on his part may or may not be incriminating and what conduct on his part may or may not be consistent with a defense to the potential criminal charges presently under investigation by the special grand jury. These are determinations not to be made by an untrained layman but rather by a qualified attorney competent in that area of law.

Thus it is evident that the Court was addressing itself to procedural safeguards in serious cases such as "charges of murder, kidnaping and the like."

In our view, this case now on appeal for the second time is at this stage in a troublesomely obscure posture. In part, this is due to the fact that events relevant to the issues have occurred since the District Court's order; also the class as defined below may not properly recognize certain sub-classes with different problems and "standing". Furthermore, on November 26, 1971 and again on May 21, 1973, after the decision of the "April panel" of this Court, 477 F.2d 1109 (1973), counsel stipulated to a temporary stay of disciplinary hearings respecting plaintiffs' class. According to the trial Court, the November 26, 1971 stay of such hearings was to continue "until the special [Wyoming County]

grand jury has made its report or until the merits of this action have been determined." This language is not entirely clear, but it suggests the possibility that counsel agreed on behalf of the State that the State would suspend all disciplinary hearings until the Wyoming County grand jury hands up its presentments or expires by operation of law. Indeed, the actual language of counsel for the State, who first proposed a stay, on November 26, 1971, to us more clearly indicates that this was and still may be the essential posture of the State of New York:

> Mr. Stenger: . . . Now, what I would like to propose, your Honor, is this, appreciating the dilemma because of the pending criminal investigation, I am authorized to state that the respondent will consent to a temporary injunction of a limited degree, namely, that no administrative disciplinary hearings will be heard as against any charges arising from the Attica insurrection up until such time as the grand jury, now about to convene and sit, has returned a report and any indictments, and the actual targets of that investigation are known.

> The Court: You mean a final report?

> Mr. Stenger: Yes, or until such time as this action is determined. In other words, we will relieve voluntarily any of these inmates of the dilemma by not proceeding, under the Court's direction, with the holding of any administrative hearings where they may be placed in this position that has been suggested, until such time as it is known whether they are the target of investigation or not, and, of course, at that time when it is known, we should be free to go ahead with those who are not a target, and then we can discuss continuation of an injunction as to those who have been determined to be a target. We are prepared and willing to consent to that, pursuant to the Court's direction, and I think that will solve the temporary dilemma in which these

people find themselves with regard to this one point. So as far as the request for injunctive relief of a temporary nature, I will make that concession on behalf of the respondent.

.　　.　　.　　.　　.　　.

In light of this language and of developments before the special grand jury, therefore, it may still be the precise position of the State of New York that: (1) it will proceed with disciplinary hearings against those plaintiffs and class members who are now known not to be grand jury targets, and (2) it will consider further stays as to those members of the class who are existing or potential targets. If this be true, then it would follow that such members of plaintiffs' class who are currently protected by the stay have no present standing to press for a determination of the merits by the district court at the present time.

But, as Judge Oakes in dissent forcefully argues, this may not have been the intent of the parties, most particularly the State of New York, on November 26, 1971, or, if it was then, it was not so when counsel entered the written stipulation, which is part of the very judgment of the district court here appealed from, on May 21, 1973. The operative language of that written "stay" makes no reference to the Wyoming County grand jury and its proceedings, but simply provides that the disciplinary hearings "shall be stayed pending the final outcome of this litigation. . . ." Possibly then, it can be inferred, as does Judge Oakes, that this new language reflects the understanding of the parties that the stay is effective pending the outcome of this case—i. e., that the parties do not wish to wait upon the special grand jury proceedings and other criminal investigations but prefer to have the merits of this case resolved in the federal courts.

Notwithstanding that this construction of the intentions of the parties and their counsel may be correct, our notions of sound federalism and of the aforementioned ambiguity of the record, sug-

gest the cautious approach of remanding this case with directions set forth hereinafter.

The motivating reasons for this conclusion are that until the special grand jury has acted, the inmate will not know whether or not a true bill has been returned against him. If not, then there still *may be* a possibility that charges *will be* preferred against him for some prison infraction. What these *may be*, if any, cannot be known until the occasion arises. Once the nature of the charges is known, the accused should be given all necessary protection. This protection can be best formulated by the District Court in light of the facts before it. If indictments have already been returned, the Court can mold necessary relief accordingly.

Specifically, the trial Court should have the parties by their counsel supplement and flesh out the record to show in reasonable detail the actions of the special grand jury and other investigative bodies to date, with particular concern, of course, for information as to which members of the plaintiffs' class have been indicted and for what charges. In this connection, we note that, since argument of this appeal, there have been newspaper reports of indictments returned by the special grand jury in Wyoming County.

Moreover, the District Court should inquire what the intent of the State now is respecting disciplinary hearings for (1) those class members who presently can be identified as non-targets of the special grand jury or any other state criminal investigation and (2) for those who are or still may be targets of such

proceedings. As was noted in Sostre v. McGinnis, 442 F.2d 178, at 196 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S. Ct. 719, 30 L.Ed.2d 740 (1972) and 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), and Nieves v. Oswald, 477 F.2d 1109, at 1113 (2d Cir. 1973), due process safeguards must vary depending upon the factual setting.[3] In light of this, it would be premature, particularly for an appellate panel, to delineate minimum due process requirements for the non-target members of the class until it is established what are the specific charges against them and what penalties may be imposed. With regard to those members of the class who are or may be targets, as already noted, they would not have standing to press their claims in the event that the State agrees before the trial Court either to forego certain disciplinary charges entirely or to stay the disciplinary hearings, at least until the special grand jury and other state criminal investigations have run their course.

Accordingly, we remand the case to the district court with directions to vacate the order appealed from and reopen the hearing to supplement the record along the two main lines heretofore described. Further, once the record has been supplemented, we note that the trial judge may wish to hear further argument relevant to the "new" or additional facts, make further findings and enter a new order or orders to properly adjudicate the rights of parties in light thereof. No costs.

OAKES, Circuit Judge (dissenting):

Seldom, in a case of such importance, has so little been decided after so much

---

3. There is a substantial difference between the named plaintiffs quite apart from probably greater differences between other members of the class. Thus, by way of illustration, the charges against these nine appear to be:

*Nieves*—giving a note to a Correctional Officer to the effect that Nieves is a member of the "Young Lords".

*Sumpter*—threatening Correctional Officers.

*Merkel*—assaulting Correctional Officers.

*Roberts*—throwing weapons to other inmates.

*Pelow*—attempting to break into gate and organizing inmates to take over offices; also with threatening a Correctional Officer.

*Ortiz*—striking officers with objects thrown from his cell.

*Figueroa*—striking an officer.

*Little*—assaulting officers.

*Hicks*—guarding hostages for four days.

time and the expenditure of so much effort by counsel and judges alike. With neither hesitation nor reluctance I dissent from a decision that is, without any question in my view, not only unwarranted in law or authority, but an abnegation of judicial duty. This appeal which was "expedited" by order of this court and was argued on July 19, 1973, *more than six months ago*, is not here being decided, since the majority's "decision" decides nothing at all. After all of this time, after careful briefing and able argument, the case is sent back to the district court to "flesh out the record," from which, inevitably, it will rise once again with our knowing no more about the legal issues than we do now. I do not believe that the case will simply disappear, as the majority apparently hopes. I believe we have a duty to decide it, one which the majority abjures.

It goes almost without saying that the majority's opinion fails to reach the merits of the case: whether inmates involved in the Attica riot, which included "except for Indian massacres . . . the bloodiest one-day encounter between Americans since the Civil War," [1] would be denied due process by having to undergo disciplinary hearings before an officer of the prison unprotected by counsel, unable to call witnesses in their behalf, and unable to cross-examine or confront the witnesses against them—hearings in which their only allowed defense is to explain their own actions in their own words, with the result that to conduct that defense they may be forced to incriminate themselves. And between the majority opinion today and the intricacies of three-judge court procedure,[2] this will be the second time that both the State and the inmate plaintiffs will have been denied a ruling on the merits. In Nieves v. Oswald, 477 F.2d 1109 (2d Cir. 1973) (*Nieves I*), a wholly different panel was faced with the same claims presented to this panel. The plaintiffs and their class of prison inmates,[3] who are subject to prison disciplinary proceedings as well as criminal prosecution, there were seeking an *injunction* against the enforcement of certain state regulations governing disciplinary hearings. This court, while not reaching the merits in its determination that a three-judge court had to be convened, stated unequivocally that the inmates' claim of "unconstitutionality of the regulations as applied where both disciplinary and criminal proceedings against an inmate are in the offing—*unquestionably raises grave constitutional issues.*" *Nieves I,* 477 F.2d at 1113 (emphasis added) (footnote omitted). The district court on remand granted a motion to withdraw the request for injunctive relief, thereby making a three-judge court unnecessary,[4] and entered a declaratory judgment dated May 23, 1973. Both parties then appealed from the order below, so that today we would be free to reach the inmates' claims on the merits were it not for the majority's present non-decision that these "unquestionably

---

1. New York State Special Commission on Attica Official Report, xi (1972).

2. *E. g.,* Thoms v. Heffernan, 473 F.2d 478 (2d Cir. 1973), petition for cert. filed, 41 U.S.L.W. 3555 (U.S. Apr. 9, 1973) (No. 72–1359).

3. The class actually designated by the district judge in the order of May 23, 1973, presently under appeal is comprised of those inmates who may be subject to disciplinary charges and criminal charges stemming from the same incident or incidents occurring at the Attica Correctional Facility during the period September 9–13, 1971.

4. Rosario v. Rockefeller, 458 F.2d 649, 651–652 n. 2 (2d Cir. 1972), aff'd, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1, rehearing denied, 411 U.S. 959, 93 S.Ct. 1920, 36 L.Ed.2d 419 (1973) ; Carter v. McGinnis, 351 F. Supp. 787, 789 n. 2 (W.D.N.Y.1972). *See also* Thoms v. Heffernan, *supra* note 2. Here the State as in *Thoms* was cooperative by stipulating to a stay of disciplinary proceedings *pending resolution of this appeal,* so that plaintiffs would not have to seek a temporary injunction, with consequent three-judge court convention, and so that the merits could be reviewed by this court more expeditiously.

. . . grave constitutional issues" are, after all, only "hypothetical." [5]

These "grave constitutional issues" are only "hypothetical," according to the majority, because "it is not known at this time what, if any, charges may be leveled against these particular inmates." Such a determination flies in the face of the decision of this court in *Nieves I*, which did not find the issues hypothetical at all, although it had fewer facts before it than the present panel, but rather found the issues so substantial as to require the convening of a three-judge court to rule on the merits. The majority here is now saying that the court in *Nieves I* was wrong and that it should have dismissed the claims as hypothetical, or at least have remanded the case to "flesh out the record." The majority, without acknowledging that it is doing so, is in effect rejecting the law of the case and overruling *Nieves I*, an action normally requiring an en banc court.

But this unwarranted and unauthorized action is inexplicable on the basis of the facts before us, unless the majority has simply closed its eyes to those facts, or unless, after six months, the facts have merely been forgotten. For instance, it is stated that "what, if any, charges may be leveled against these particular inmates" is "not known at this time." [6] This is simply not true. As for the disciplinary charges, they are stated in the Amended Complaint and admitted by the State in its Answer.[7] They are even summarized in footnote 3 of the majority opinion. The State further admits in its Answer that disciplinary hearings *will* be held against these inmates, except as stayed by the court order, and that certain disciplinary hearings have already been held against inmates because of activities during the

---

5. It may be questioned by what authority the district court may retain jurisdiction over this case to "flesh out the record," as directed by the majority, when the case has been found too "hypothetical" to decide. My understanding has always been that if a case is too conjectural or hypothetical to present a case or controversy, then a federal court has no jurisdiction over it. *See* O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed. 2d 674 (U.S. Jan. 15, 1974) ; Roe v. Wade, 410 U.S. 113, 127–129, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973). *Cf.* Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 149, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). On the other hand, a federal court presented with a case or controversy is bound to decide it, not to postpone decision until such time as further facts may make a decision easier or, for that matter, even better. Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) (Marshall, C. J.) :

It is most true, that this court will not take jurisdiction if it should not; but it is equally true, that it must take jurisdiction, if it should . . . . Questions may occur which we would gladly avoid; but we cannot avoid them.

The majority, however, without citation to any authority whatsoever ignores these fundamental principles of federal jurisprudence and strikes off on what can be described at best as a novel approach to federal abstention.

6. If indeed the majority does not know this and other facts it deems important to a decision on the merits, it is not clear why it is necessary to remand the case to determine them. It is not beyond the power or propriety of this court itself to check the public records of the Wyoming County Supreme Court or to communicate with both the parties and to ask them to supply such information. This could be achieved either through written communications or reargument. *Cf.* Brown v. Board of Education, 344 U.S. 141, 73 S.Ct. 124, 97 L.Ed. 152 (1952). In either case, this self-same panel could then actually decide the case presented to it. By rejecting these possibilities, the majority demonstrates not its "notions of sound federalism" but its desire to avoid decision, with a consequent waste of judicial time and resources.

7. Plaintiff Ortiz has been charged with having thrown objects out of his cell and striking officers with the objects as well as cursing officers. Plaintiff Roberts has been charged with providing other inmates with weapons and carrying a gas mask and tear gas canister. Plaintiff Merkel has been charged with assaulting two correctional officers and acting in concert with others. Plaintiff Sumpter has been charged with threatening two correctional officers. Plaintiff Nieves has been charged with carrying a note. The other named plaintiffs are no longer inmates.

riot. Thus, it *is* known what the disciplinary charges are against these plaintiffs, and those charges, while certainly not exhaustive of all possible charges, are representative of a gamut of charges so as to present questions of law common to the members of the class, as found by the district court and reiterated in *Nieves I.* As to criminal charges, plaintiffs Sumpter, Merkel and Ortiz have already been indicted in six separate indictments on 100 counts of criminal activity ranging from Promoting Prison Contraband to Assault and Kidnaping.[8] Plaintiffs Nieves and Roberts have not yet been indicted. At least 57 other inmates and former inmates have been indicted on some 1,300 counts of criminal activity.[9] Moreover, as to the named plaintiffs, their indictments were handed down before the district court's declaratory judgment and even before this court's decision in *Nieves I,* so that it can hardly be said that the district court's declaratory judgment was "somewhat hypothetical."

The majority states in its opinion: "Once the nature of the charges are [sic] known, the accused should be given all necessary protection." As shown above, at least as to three of the named plaintiffs, the nature of *both* the disciplinary and criminal charges is known. And these plaintiffs' charges are representative of those of their class.[10] The majority, ignoring these facts, then says that the "protection can be best formulated by the District Court in light of the facts before it." *That is precisely what the district court has already done and what is presented to this court for review.* That protection is what is being vacated by the majority on no legal basis, but merely to remand the case to search for facts already before the majority. The majority acknowledges Judge Henderson's "lengthy" opinion, which is lengthy because—even though I disagree with some of it—it analyzes the merits in light of the facts in some depth.

In Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) (en banc), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 and 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), this court did not deny due process to prison inmates in disciplinary hearings, but rather stated that the process due would depend on the circumstances and factual setting. 442 F.2d at 196. *See Nieves I,* 477 F.2d at 1113. The majority, while citing both of these passages, notes that plaintiffs and the members of their class

---

8. Merkel—Indictment No. 11.
   6 counts of 1st Degree Assault
   2 counts of Illegal Possession of Weapons as a Felony
   2 counts of Promoting Prison Contraband
   Ortiz—Indictment No. 7.
   6 counts of 2d Degree Kidnaping
   6 counts of 1st Degree Unlawful Imprisonment
   6 counts of 1st Degree Coercion
   5 counts of 2d Degree Assault
   —Indictment No. 8.
   9 counts of 2d Degree Kidnaping
   9 counts of 1st Degree Unlawful Imprisonment
   9 counts of 1st Degree Coercion
   —Indictment No. 17.
   2 counts of 2d Degree Assault
   —Indictment No. 31.
   2 counts of 2d Degree Assault
   Sumpter—Indictment No. 8.
   9 counts of 2d Degree Kidnaping
   9 counts of 1st Degree Unlawful Imprisonment

   9 counts of 1st Degree Coercion
   —Indictment No. 9.
   3 counts of 2d Degree Kidnaping
   3 counts of 1st Degree Unlawful Imprisonment
   3 counts of 1st Degree Coercion
   The foregoing is a matter of public record of which we may take judicial notice. Brown v. Board of Education, 344 U.S. 1, 3, 73 S.Ct. 1, 97 L.Ed. 3 (1952); Bryant v. Carleson, 444 F.2d 353, 357–358 (9th Cir.), cert. denied, 404 U.S. 967, 92 S.Ct. 344, 30 L.Ed.2d 287 (1971); Wagner v. Fawcett Publications, 307 F.2d 409 (7th Cir. 1962), cert. denied, 372 U.S. 909, 83 S.Ct. 723, 9 L.Ed.2d 718 (1963). Verification is a local telephone call (212–488–4044) away from the United States Courthouse at Foley Square.

9. This was reported in T. Wicker, *Attica Reopened,* N.Y. Times, Jan. 4, 1974, at 29, col. 1 (city ed.), but if that report were doubted it too is subject to easy verification.

10. *See* note 3 *supra.*

are subject to a wide variety of disciplinary charges, *see* majority opinion at note 3 *supra*, and concludes that it would be "premature" to determine the process due before learning what *each* inmate is charged with and what the possible disciplinary penalties are.

What the majority totally misses, however, is that the factual setting here which calls for special attention is not the charge or penalty in the disciplinary hearing at all; rather it is that an inmate's only means of defending himself from the disciplinary charge according to the challenged regulations is to explain in his own words, unaided by counsel, what happened. Ordinarily this might well suffice, and the regulations as generally applied are not challenged here. In this set of circumstances, however, where the inmate is already indicted for serious crimes (as are three of the named plaintiffs and more than 57 other inmates) arising out of, or where the grand jury is engaged in an investigation of, the same incidents furnishing the basis for disciplinary charges, the inmate is forced to choose between possibly incriminating himself in the criminal proceeding or presenting no defense at all in the disciplinary hearing. Thus, this case does not turn on what the particular disciplinary or criminal charge may be, but rather on the dual jeopardy involved where the State is proceeding with both disciplinary and criminal actions against inmates involved in the Attica disturbance.

The majority, unable to sweep all the way under the rug this grave constitutional issue noted by this court in *Nieves I*, by the court below, and by a number of other courts,[11] avoids the question of what process is due in this situation by suggesting that somehow

the question is not yet ripe because of a "temporary injunction" the State consented to on November 26, 1971 (hereinafter the "1971 stay"). The majority lifts a passage out of context from the hearing that day to discover, or, more accurately, to imagine an intent by the State not to hold disciplinary hearings against anyone until the special grand jury makes its final report, and additionally a willingness by the State to "consider further stays as to those members of the class who are . . . targets." By rejecting the record as presented to this court, the majority takes what it euphemistically calls "the cautious approach" of remanding the case to discover what the State's intent was and what it *is* willing to consider now.[12] Needless to say, this "cautious approach" will cost courts and counsel literally hundreds of extra hours to determine facts in respect to each inmate member of the class when in respect to representative members of the inmate class there are already sufficient facts before this panel to resolve the grave issues presented. One would suppose that, despite the majority, the merits will have to be passed upon by this court someday—perhaps sooner than later. But one must regret that in the busy Western District of New York the trial judges have to spend their time "fleshing out" an already sufficient record.

The intent of the State in consenting to the 1971 stay is clearly seen even in the language quoted by the majority once that language is viewed in context. On November 26, 1971, plaintiffs argued before the district court for a preliminary injunction against all disciplinary hearings arising out of the events at Attica. The State consented to such a temporary injunction except that it

---

11. *See, e. g.*, Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. Nov. 16, 1973); Sands v. Wainwright, 357 F.Supp. 1062, 1092–1093 (M.D.Fla.1973); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157, 1167 (E.D.Wis.1973); Carter v. McGinnis, 351 F.Supp. 787, 792–795 (W.D.N.Y.1972); Clutchette v. Procunier, 328 F.Supp. 767, 783 (N.D.Cal.1971).

12. Again, it is hard to understand why the majority is so reluctant to ask the State the very questions it directs the district court to ask. Either by letter or reargument—the majority not having asked any of these questions in initial argument—the majority could answer its own questions and thereby "flesh out" its own record which it finds so lacking.

wished to be able to proceed with disci-plinary hearings against any inmate cleared by the special grand jury, be-cause such an inmate would not be sub-ject to the possibility of self-incrimina-tion. But it could not be known until the special grand jury had finished its work and made its report which inmates had been cleared and which indicted. Thus, the State consented to a tempo-rary injunction pendente lite against all disciplinary hearings arising from events during the Attica disturbances, *but* if the special grand jury made its final report *before the litigation ended,* then the State would be free to proceed against anyone not indicted, and would discuss an extension of the temporary injunction pendente lite as to those in-dicted. The language quoted by the ma-jority reflects this understanding as it is in the disjunctive, stating that the temporary injunction will last either un-til the special grand jury's report *or* un-til the action's determination. If there had been any doubt, which there was not until the majority's invention of it, the district court's order should have elimi-nated it:

> Such stay, by agreement of the par-ties, is to continue either until the Special Grand Jury has made its re-port or until the merits of this action have been determined, *whichever event occurs first.*

Nieves v. Oswald, Civil 1971–526 (W. D.N.Y. Mar. 8, 1972) (emphasis added). Thus, it is absolutely certain that this 1971 stay can provide no basis for avoid-ing decision here on the clearly fabricat-ed notion that the 1971 stay prevents the issue from being ripe until the grand jury makes its report—a claim never suggested by the State.

Moreover, even were it otherwise—and this makes the majority opinion border on the incredible—the 1971 stay was supplanted by a written stipulation between the parties on May 23, 1973, which stated that disciplinary proceed-ings would be stayed only "pending the final outcome of this litigation." [13] No mention is made of the special grand jury at all. *This* stipulation, pursuant to which the judgment appealed from was entered, is what governs this case. It is beyond belief to suggest as the ma-jority does that the State, which entered into the stipulation for the express pur-pose of expediting the appeal on the merits,[14] intended thereby to destroy the plaintiffs' "present standing" and conse-quently lose an adjudication on the mer-its.

The majority, however, does not let mere logic, plain language, or the intent of the parties stand in the way of a de-termination to avoid the merits. Rather the majority suggests that it may be the position of the State that "it will consid-er further stays as to those members of the class who are existing or potential targets," [15] reasoning that such "further stays" would save the inmates from any immediate threat and that thus their claims are not ripe for determination.

---

13. The entire stipulation is as follows:
1. It is hereby stipulated that the at-tached judgment may be entered by the Court in lieu of the previously entered in-junctive order, to obviate the need for a three-judge court and to expedite the ap-peal from such judgment, without preju-dice to the parties' respective challenges to the substance of such judgment.
2. It is further stipulated that the disci-plinary proceedings described in paragraph 1 of the attached judgment shall be stayed pending the final outcome of this litiga-tion, but plaintiffs shall not assert the de-lay in holding such hearings resulting from such stay, as a basis for challenging such hearings when they are in fact held.

14. *See id.*

15. As explained above, this language in con-text in 1971 referred to the State's willing-ness to consider further stays pendente lite if the special grand jury made its reports before the action was finally determined. It was not referring to any willingness to ex-tend stays beyond the pendency of the litiga-tion. Indeed, the State's Answer admits that disciplinary hearings "will be held" against plaintiffs, and there has been no suggestion or indication that the State is forbearing from proceeding for any reason other than the stay pending the determina-tion of this action.

For the third time, it must be questioned why the majority does not itself ask the State what it will consider, rather than wasting counsel's and judges' time and resources on a needless remand. It may, moreover, be questioned by what right the majority can suggest to the State a means by which it might destroy the ripeness of plaintiffs' claims. While it may not be beyond judicial propriety to make suggestions aimed at settlement, or perhaps in some cases to mediate a controversy, a court cannot take sides, suggesting means to one party that will enable that party to avoid a possible adverse judgment by destroying the court's jurisdiction or the justiciability of a claim.

More importantly, however, the majority does not explain the relevance of what the State might "consider" in the future to the present ripeness of the issues or the "present standing" of the plaintiffs. The *present* ripeness or standing is determined by the present adverse controversy. The State has admitted its intent to proceed with the disciplinary hearings and has never suggested its willingness to do otherwise.[16] In such a situation the plaintiffs are under an immediate threat but for the stay pending the outcome of the litigation. Such a stay no more negates the justiciability of their claims than a preliminary injunction makes the need for a permanent injunction moot.

I have tried to demonstrate that the majority's nondecision today results in a senseless waste of judicial resources, not only of this court both in *Nieves I* and the present case, but also of the district court, which attempted to do what the majority here commands it to do once again—fashion the necessary protection for the inmates in light of the facts. The majority in vacating the reasoned protections already worked out by the district court—protections which, to be sure, I think somewhat insufficient—gives no legal basis for its action. Rather it claims ignorance of facts before it; it finds an ambiguity in the record where none exists; and its "notions of sound federalism" are unexplained. I also think they are nonexistent in law.

On the merits, I think that the teachings of *Sostre* itself, when viewed in the light of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and Gagnon v. Scarpelli, 411 U. S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)—cases neither referred to nor apparently considered by the majority—compel us to reach essentially the results already reached in First Circuit, Seventh Circuit, Eighth Circuit and a host of recent district court cases simply noted here.[17] The challenged New York regulations fall short of providing minimal due process to inmates threatened simultaneously with criminal proceedings and disciplinary hearings. It would be neither novel nor unwarranted for this court to specify, for the benefit of all parties concerned, as the court below already has done, in what ways the State's regulations are deficient. Nor

---

16. *See id.*

17. *See, e. g.*, Gomes v. Travisono, 490 F.2d 1209 (1st Cir. Dec. 28, 1973); Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. Nov. 16, 1973); McDonnell v. Wolff, 483 F.2d 1059 (8th Cir.), cert. granted, 414 U.S. 1156, 94 S.Ct. 913, 39 L.Ed.2d 108 (U.S. Jan. 21, 1974); United States ex rel. Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973); Rhem v. Malcolm, 371 F.Supp. 594 (S.D.N.Y. Jan. 7, 1974); Wesson v. Moore, 365 F.Supp. 1262 (E.D.Va.1973); Collins v. Hancock, 354 F.Supp. 1253 (D.N.H.1973); Batchelder v. Geary, No. C–71–2017 RFP (N.D.Cal. Apr. 13, 1973); Sands v. Wainwright, 357 F.Supp. 1062 (M.D.Fla.1973); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157 (E.D.Wis.1973); Carter v. McGinnis, 351 F.Supp. 787 (W.D.N.Y.1972); Rankin v. Wainwright, 351 F.Supp. 1306 (M.D.Fla. 1972); Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich.1972); Stewart v. Jozwiak, 346 F.Supp. 1062 (E.D.Wis.1972); Nelson v. Heyne, 355 F.Supp. 451 (N.D.Ind.1972); Brown v. Schubert, 347 F.Supp. 1232 (E.D. Wis.1972); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (E.D.Pa.1972); Landman v. Royster, 333 F.Supp. 621 (E.D. Va.1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971).

would such a decision by this court entail writing a code of prison regulations for the State of New York any more than Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), entailed writing a code of administrative law regulations for that state. But to the extent that New York's regulations *are* deficient in providing prisoners in the situation of those at bar with minimal due process, this court should not flinch from its duty to declare them so with the attendant consequences.

Accordingly, with some dismay, I dissent.

## ON PETITION FOR REHEARING

TYLER, District Judge:

Following this court's decision of January 30, 1974, Nieves v. Oswald, a petition for rehearing was granted in order to clarify certain aspects of the record. Argument was heard on April 4, 1974. Familiarity with the facts at issue will be assumed.

In response to this court's question in the January 30th opinion about the state's intentions concerning the holding of disciplinary hearings, counsel for the state secured and filed a statement from Peter Preiser, Commissioner of the New York State Department of Correctional Services. In that statement, the Department made it clear that it will not hold disciplinary proceedings concerning the behavior of any of the inmates in the Attica disturbance of September 9–13, 1971. Defendants-Appellants Second Supplemental Brief, filed April 3, 1974. At oral argument the following day, leave to submit briefs on the issue of mootness was granted. The last of these briefs was received on May 6, 1974, and decision by this court is now appropriate. We conclude that this case is moot.

In DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (April 23, 1974), the Supreme Court, in a case analogous to the instant one, vacated the judgment of the state court because it found that events occurring subsequent to the filing of the suit had rendered the case moot. *DeFunis* involved a challenge to the procedures and criteria employed by the Law School Admissions Committee of the University of Washington on the grounds that they violated the Equal Protection Clause of the Fourteenth Amendment. Specifically, the petitioner, DeFunis, claimed that he had been denied admission to the law school because of his race. The trial court ordered his admission to the law school, and by the time the case reached oral argument before the Supreme Court, DeFunis had registered for the final quarter of his last year in law school. Furthermore, respondents stated that regardless of the outcome of the appeal, DeFunis would be awarded his J.D. degree at the end of the academic year. The Supreme Court held that "[b]ecause the petitioner will complete his law school studies at the end of the term for which he has now registered regardless of any decision this Court might reach on the merits of this litigation, we conclude that the Court cannot, consistently with the limitations of Art. III of the Constitution, consider the substantive constitutional issues tendered by the parties." 416 U.S. at 319, 94 S.Ct. at 1707.

The reasoning of the Supreme Court in *DeFunis* is controlling in the instant case. There is no longer a possibility that any of the members of plaintiffs' class [1] will be subject to disciplinary hearings as a result of the events at Attica between September 9th and 13th. The controversy is thus no longer "definite and concrete", Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The question of what safeguards would have been required at disciplinary proceedings, if

---

1. The class designated by the district judge was composed of all those inmates who may be subject to disciplinary charges and criminal charges stemming from the Attica disturbance of September 9–13, 1971.

the state had not decided to forego these proceedings, is surely an academic one.

It does not matter, in this case, that the circumstances which have led to the dropping of any possible disciplinary proceedings stem from the voluntary action of the state. The state has made its decision not to proceed with disciplinary proceedings as a matter of record, and there is certainly no reason to believe that, once this case is dismissed, the state will then reinstitute disciplinary charges. As was pointed out in *DeFunis*, 416 U.S. at 317, 94 S.Ct. at 1706, "[i]t has been the settled practice of the Court, in contexts no less significant, fully to accept representations such as these as parameters for decision. See Gerende v. Elections Board, 341 U.S. 56 [71 S.Ct. 565, 95 L.Ed. 745] (1951); Whitehill v. Elkins, 389 U.S. 54, 57–58 [88 S.Ct. 184, 19 L.Ed.2d 228] (1967); Ehlert v. United States, 402 U.S. 99, 107 [91 S.Ct. 1319, 28 L.Ed.2d 625] (1971); cf. Law Students Research Council v. Wadmond, 401 U.S. 154, 162–163 [91 S.Ct. 720, 27 L.Ed.2d 749] (1971)." Moreover, this is not one of those cases where the respondent has changed its disciplinary practices and thus attempted to deprive the court of the power to hear the case. See, *e. g.*, United States v. Phosphate Export Assn., 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 19 L.Ed.2d 821 (1963); United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). As in *DeFunis*, the general policy here remains unchanged, but the individuals bringing the suit are no longer the present targets of disciplinary proceedings.

It is of course, true that some of the members of the present class still remain in prison and hence may possibly become once again the subject of both disciplinary and criminal proceedings. This is not a case, however, like Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1, (April 16, 1974), where the governmental activity "by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." 416 U.S. at 122, 94 S.Ct. at 1698. In *Super Tire*, the issue was whether striking workers were eligible for assistance from state welfare programs. The Supreme Court, in a 5 to 4 decision, held the case not to be moot even though before the case was tried the strike had come to an end. The court found that the availability of state welfare assistance had a continuing effect on the present interests of the parties. As petitioners there argued, the eligibility of striking workers to receive benefits "[a]ffects the collective bargaining relationship, both . . . when a collective bargaining agreement is in process of formulation, and in the ongoing collective-bargaining relationship, so that the economic balance between labor and management, carefully formulated and preserved by Congress in the federal labor statutes, is altered by the State's beneficent policy toward strikers."

416 U.S. at 124, 94 S.Ct. at 1699.

In the instant case, the disciplinary procedures employed by the state do not have such an effect on any legitimate present interests of the class members. Furthermore, the threat of governmental action here, unlike in *Super Tire*, is "two steps removed from reality." 416 U.S. at 123, 94 S.Ct. 1694. In *Super Tire*, once the workers went on strike, the reception of welfare assistance was automatic. Here, even if inmates commit a criminal offense, the state must still decide, in each case, if it is going to hold disciplinary as well as criminal proceedings.

Since this case involves governmental action, the question as to whether or not the issues here are "capable of repetition, yet evading review," Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), must be considered. Super Tire, 416 U.S. 115, 94 S.Ct. at 1694, 40 L.Ed. 2d 1; Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

If this were found to be such a case, it could well be found to be "amenable to federal adjudication even though it might otherwise be considered moot." *DeFunis*, 416 U.S. at 319, 94 S.Ct. at 1707. This is not such a case. As has been argued by petitioners, both in their brief of April 26, 1974, and at oral agreement, the situation where a prison inmate is subject to both criminal and disciplinary proceedings is not an uncommon one. The dropping of disciplinary proceedings in the present case certainly cannot be taken to mean that the state will follow this course in all future actions. It must be realized that it is in the interests of the state to have its disciplinary proceedings passed upon so that subsequent disciplinary hearings will not also be stayed. Moreover, due to the intricacies of three-judge court procedure, see Nieves v. Oswald, 477 F.2d 1109 (2d Cir. 1973), and the necessity for granting a rehearing, this case has taken an unusually long time to decide. It is likely, therefore, that future cases raising this issue will be ripe for decision much earlier than 2½ years after the event in issue.

Because disciplinary hearings are no longer contemplated against any of the inmates involved in the Attica disturbances of September, 1971, we remand this case to the district court with the direction to enter an order dismissing the action as moot.

OAKES, Circuit Judge (dissenting):

I dissent.

This rather incredible case, which commenced November 16, 1971, and first came to the court for decision rendered on April 20, 1973, Nieves v. Oswald (*Nieves I*), 477 F.2d 1109 (2d Cir. 1973), is now declared moot because the current Commissioner of Correctional Services is said by the State under date of April 3,

1974, on reargument after the second trip to this court, to take the position that

> In sum, the delay of more than two and a half years in conducting disciplinary hearings occassioned [sic] by the court injunction, has destroyed the Department's ability to properly conduct and enforce internal disciplinary measures against the inmates in question and the Department must defer to the criminal prosecutions.

Defendants-Appellants' Second Supplemental Brief at 7.[1]

I have previously stated in dissent in the second appeal to us, Nieves v. Oswald (*Nieves II*), *supra*, 802, 806 et seq., that the majority decision then rendered was "unwarranted in law or authority" and "an abnegation of judicial duty." There, it will be recalled, the majority sent the case back to the late Chief Judge Henderson to "flesh out the record," at 806, although the dissent urged rather strongly that the factual setting was quite sufficiently set forth to decide the "grave constitutional issues," *Nieves I*, 477 F.2d at 1113, presented in the case. *Nieves II*, at 809–811. The dissent previously labored almost tiresomely to get the majority to ask the State its intentions outright and "questioned by what right the majority can suggest to the State a means by which it might destroy the ripeness of plaintiffs' claims . . . [or] means . . . to avoid a possible adverse judgment by destroying the court's jurisdiction or the justiciability of a claim." *Id.* at 812. So now the claim is not justiciable as moot. The State can (and does) blame the federal courts, and the "grave constitutional issues," certain to arise anew unless now the State changes its procedures and regulations better to conform to the decisions of the day,[2] remain undecided.

---

1. It is to be noted that the State *consented to a stay* of disciplinary proceedings and was not enjoined; had it been enjoined, appeal would have lain only to the Supreme Court.

2. In addition to the cases referred to in the *Nieves II* dissent, note 17, at 812, add the compelling Ninth Circuit opinion of Judge Hufstedler (joined by Judge Tuttle of the

I would follow United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). There, Mr. Justice Clark, with only Justices Black and Douglas dissenting (on other grounds), said the following:

> Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot. . . . A controversy may remain to be settled in such circumstances, . . . *e. g.*, a dispute over the legality of the challenged practices. . . . The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.

345 U.S. at 632 (citations and footnote omitted).

There is nothing here to stop the State of New York, under a new Commissioner of Corrections and Services, from recommencing disciplinary proceedings against any of the plaintiffs' class here. The disciplinary procedures and regulations of the State remain in force and would govern future proceedings. As said in Gray v. Sanders, 372 U.S. 368, 376, 83 S.Ct. 801, 806, 9 L.Ed.2d 821 (1963), "the voluntary abandonment of a practice does not relieve a court of adjudicating its legality, particularly where the practice is deeply rooted and long standing." Only a few days ago the Court said, "It is settled that an action for an injunction does not become

Fifth Circuit), Clutchette v. Procunier, 497 F.2d 809 (9th Cir. Apr. 25, 1974). *See also*

moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants 'would be "free to return to . . . [their] old ways.'" Allee v. Medrano, —— U.S. ——, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (U.S. May 21, 1974).

Moreover, if what has happened in this court, *see Nieves II* dissent, *supra*, is any sample, this is precisely a case where the issues are "capable of repetition, yet evading review." Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (U.S. Apr. 16, 1974), *quoting* Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). We still have a three-judge court procedure; I had always thought it was cumbersome, intricate and, as I said in a little piece, a "morass and mystery, if not miasma . . . ." Oakes, The Three-Judge Court and Direct Appeals to the Second Circuit, 48 St. John's L.Rev. 205, 210 (1973). In comparison to this direct appeal, at least, a straight three-judge court proceeding would have been streamlined.

I would, as the *Nieves II* dissent intimated, decide this case on the merits, and not—in these days of burgeoning dockets and heavy case loads—pass the judicial buck to another future panel. Accordingly, I dissent—not with the "dismay" of *Nieves II*—but with wonderment at having witnessed what turns out to be a Punch and Judy show rather than a momentous judicial struggle involving "grave constitutional issues" and yes, real live (and some dead) people.

Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (U.S. Apr. 29, 1974).