WHITEHILL *v.* ELKINS, PRESIDENT, UNIVER-
SITY OF MARYLAND, ET AL.

No. 25.   Argued October 16, 1967.—Decided November 6, 1967.

*Sanford Jay Rosen* argued the cause for appellant. With him on the brief were *Elsbeth Levy Bothe* and *Joseph S. Kaufman.*

*Loring E. Hawes,* Assistant Attorney General of Maryland, argued the cause for appellees. With him on the brief was *Francis B. Burch,* Attorney General.

*Bernard Wolfman* and *Herman I. Orentlicher* filed a brief for the American Association of University Professors, as *amicus curiae,* in support of appellant.

*Edward C. Mackie* filed a brief for the Baltimore Metropolitan Chapter of Americans for Constitutional Action, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This suit for declaratory relief that a Maryland teacher's oath required of appellant was unconstitutional was heard by a three-judge court and dismissed. 258 F. Supp. 589. We noted probable jurisdiction. 386 U. S. 906.

Appellant, who was offered a teaching position with the University of Maryland, refused to take the following oath:

"I, ————————, do hereby (Print Name— including middle initial) certify that I am not engaged in one way or another in the attempt to overthrow the Government of the United States, or the State of Maryland, or any political ·subdivision of either of them, by force or violence.

"I further certify that I understand the aforegoing statement is made subject to the penalties of perjury prescribed in Article 27, Section 439 of the Annotated Code of Maryland (1957 edition)."

The question is whether the oath is to be read in isolation or in connection with the Ober Act (Art. 85A, Md. Ann. Code, 1957) which by §§ 1 and 13 defines a "subversive" as ". . . any person who commits, attempts to commit, or aids in the commission, or advocates, abets, advises or teaches by any means any person to commit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or *alter*, or to assist in the overthrow, destruction or *alteration* of, the constitutional form of the government of the United States, or of the State of Maryland, or any political subdivision of either of them, *by revolution, force, or violence;* or who is a *member of a subversive organization* or a foreign subversive organization, as more fully defined in this article." (Italics supplied.) Section 1 defines the latter terms: "subversive organization" meaning a group that would, *inter alia,* "alter" the form of government "by revolution, force, or violence"; "foreign subversive organization" is such a group directed, dominated, or controlled by a foreign government which engages in such activities.

The oath was prepared by the Attorney General and approved by the Board of Regents that has exclusive management of the university. It is conceded that the Board had authority to provide an oath, as § 11 of the Act directs every agency of the State which appoints, employs, or supervises officials or employees to establish procedures designed to ascertain before a person is appointed or employed that he or she "is not a subversive person." And that term is, as noted, defined by §§ 1 and 13. Our conclusion is that, since the authority to prescribe oaths is provided by § 11 of the Act and since it is in turn tied to §§ 1 and 13, we must consider the

oath with reference to §§ 1 and 13, not in isolation. Nor can we assume that the Board of Regents meant to encompass less than the Ober Act, as construed, sought to cover.

If the Federal Constitution is our guide, a person who might wish to "alter" our form of government may not be cast into the outer darkness. For the Constitution prescribes the method of "alteration" by the amending process in Article V; and while the procedure for amending it is restricted, there is no restraint on the kind of amendment that may be offered. Moreover, the First Amendment, which protects a controversial as well as a conventional dialogue (*Terminiello* v. *Chicago,* 337 U. S. 1), is as applicable to the States as it is to the Federal Government; and it extends to petitions for redress of grievances (*Edwards* v. *South Carolina,* 372 U. S. 229, 235) as well as to advocacy and debate. So if §§ 1 and 13 of the Ober Act are the frame of reference in which the challenged oath is to be adjudged, we have important questions to resolve.

We are asked to treat §§ 1 and 13 as if they barred only those who seek to overthrow or destroy the Government by force or violence. Reference is made to *Gerende* v. *Election Board,* 341 U. S. 56, where, in considering the definition of "subversive" person applicable to § 15 of the Act, governing candidates for office, we accepted the representation of the Attorney General that he would advise the proper authorities in Maryland to take and adopt the narrower version of the term "subversive." The Court of Appeals of Maryland had indicated in *Shub* v. *Simpson,* 196 Md. 177, 76 A. 2d 332, that the purpose of the Act was to reach that group, and that the words "revolution, force, or violence" in § 1 did not include a peaceful revolution but one accomplished by force or violence. *Id.,* at 190–191, 76 A. 2d, at 337–338. In that view the "alteration" defined would be an altera-

tion by force and violence. That construction had not yet been fashioned into an oath or certificate when *Gerende* reached us. That case involved an attempt by a candidate for public office in Maryland to require the election officials to dispense with an oath that incorporated the statutory language. The Court of Appeals refused the relief asked. We referred to the narrow construction of §§ 1 and 15 given in the *Shub* case saying:

> "We read this decision to hold that to obtain a place on a Maryland ballot a candidate need only make oath that he is not a person who is engaged 'in one way or another in the attempt to overthrow the government *by force or violence,*' and that he is not knowingly a member of an organization engaged in such an attempt. [196] Md. at [192], 76 A. 2d at 338. At the bar of this Court the Attorney General of the State of Maryland declared that he would advise the proper authorities to accept an affidavit in these terms as satisfying in full the statutory requirement. Under these circumstances and with this understanding, the judgment of the Maryland Court of Appeals is affirmed." 341 U. S., at 56–57.

As we said in *Baggett* v. *Bullitt,* 377 U. S. 360, 368, n. 7, we did not pass upon or approve the statutory definition of a "subversive" person in the *Gerende* case. Rather we accepted the narrowing construction tendered by the Attorney General during oral argument so as to avoid the constitutional issue that was argued.

It is, however, urged that § 18 of the Act which contains a severability clause makes it possible for the Maryland Attorney General and for us to separate the wheat from the chaff that may be in §§ 1 and 13. The District Court found merit in the point. 258 F. Supp., at 596. But our difficulty goes deeper. As we have said in like situations, the oath required must not be so

vague and broad as to make men of common intelligence speculate at their peril on its meaning. *Baggett v. Bullitt, supra; Elfbrandt* v. *Russell,* 384 U. S. 11; *Keyishian* v. *Board of Regents,* 385 U. S. 589. And so we are faced with the kind of problem which we thought we had avoided in *Gerende.*

As we have seen, §§ 1 and 13 reach (1) those who would "alter" the form of government "by revolution, force, or violence" and (2) those who are members of a subversive organization or a foreign subversive organization.

The prescribed oath requires, under threat of perjury, a statement that the applicant is not engaged "in one way or another" in an attempt to overthrow the Government by force or violence. Though we assume *arguendo* that the Attorney General and the Board of Regents were authorized so to construe the Act as to prescribe a narrow oath (1) that excluded "alteration" of the Government by peaceful "revolution" and (2) that excluded all specific reference to membership in subversive groups, we still are beset with difficulties. Would a member of a group that was out to overthrow the Government by force or violence be engaged in that attempt "in one way or another" within the meaning of the oath, even though he was ignorant of the real aims of the group and wholly innocent of any illicit purpose? We do not know; nor could a prospective employee know, save as he risked a prosecution for perjury.

We are in the First Amendment field. The continuing surveillance [1] which this type of law places on teachers is

---

[1] There is not only the provision for perjury prescribed in § 11, but also § 14 which provides in part that "Reasonable grounds on all the evidence to believe that any person is a subversive person, as defined in this article, shall be cause for discharge" of the employee. See *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 175, n. 1 (concurring opinion).

hostile to academic freedom. As we said in *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250:

> "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any straitjacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

The restraints on conscientious teachers are obvious. As we noted in the *Elfbrandt* case, even attendance at an international conference might be a trap for the innocent if that conference were predominantly composed of those who would overthrow the Government by force or violence. 384 U. S., at 16–17. "Juries might convict though the teacher did not subscribe to the wrongful aims of the organization." *Id.,* at 17.

In sum, we read the oath as an integral part of the Ober Act; and we undertake to read §§ 1 and 13 of that Act in light of the gloss that the Maryland courts have placed on it. We know that the *Shub* case says that "[a] person who *advocates* the overthrow of the Government of the United States . . . through force or violence could scarcely in good faith, take the constitutional oath of office . . . ." 196 Md., at 190, 76 A. 2d, at 337. (Italics supplied.) Yet that case does little more than

afford the basis for argument that membership in a subversive organization means that the member must advocate a violent overthrow. This, however, is speculation, not certainty. Another Maryland case bearing on the question is *Character Committee* v. *Mandras,* 233 Md. 285, 196 A. 2d 630. There an applicant for admission to the Maryland bar answered "No" to the question "Are you now or have you ever been a subversive person as defined by the [Ober Act]?" He had apparently at one time been a member of the Communist Party. At a hearing he testified he had joined the party because he was interested in the candidacy of Henry Wallace and in the cause of civil liberties; but he denied he had been a subversive person or that he had advocated violent overthrow of the Government. The Court of Appeals affirmed the Board of Law Examiners, finding that the applicant was not a subversive person. So it can be argued that passive membership as a matter of Maryland law does not make a person a subversive. Yet, as we read §§ 1 and 13 of the Ober Act, the alteration clause and membership clause are still befogged.[2] The

---

[2] Art. 15, § 11, of the Maryland Constitution reads:

"No person who is a member of an organization that advocates the overthrow of the Government of the United States or of the State of Maryland through force or violence shall be eligible to hold any office, be it elective or appointive, or any other position of profit or trust in the Government of or in the administration of the business of this State or of any county, municipality or other political subdivision of this State."

*Shub* tells us that the Ober Act was enacted pursuant to this state constitutional provision. 196 Md., at 192, 76 A. 2d, at 338. Our attention is not drawn to, nor have we found, any severability clause applicable to this constitutional provision. It is certainly dubious, then, whether the severability clause of the Ober Act can operate to "sever" the membership clause in the definition of subversive person so that it reads more narrowly than the constitutional provision upon which the Ober Act rests.

lines between permissible and impermissible conduct are quite indistinct. Precision and clarity are not present. Rather we find an overbreadth that makes possible oppressive or capricious application as regimes change. That very threat, as we said in another context (*NAACP* v. *Button,* 371 U. S. 415, 432–433), may deter the flowering of academic freedom as much as successive suits for perjury.

Like the other oath cases mentioned, we have another classic example of the need for "narrowly drawn" legislation (*Cantwell* v. *Connecticut,* 310 U. S. 296, 311) in this sensitive and important First Amendment area.

*Reversed.*

Mr. Justice Harlan, whom Mr. Justice Stewart and Mr. Justice White join, dissenting.

Maryland will doubtless be surprised to learn that its meticulous efforts to conform the state "loyalty oath" to the requirements of *Gerende* v. *Election Board,* 341 U. S. 56, have been to no avail. It will also be entitled to feel baffled by an opinion which, while recognizing the continuing authority of *Gerende,* undertakes to bypass that decision by a process of reasoning that defies analysis.

Appellant Whitehill was denied employment in the state university as a temporary lecturer by reason of his refusal to sign an oath that more than meets the requirements of *Gerende.* He was asked only whether he is *now,* in one way or another *engaged in* an attempt to overthrow the Government *by force or violence.*[1] References to international conferences, controversial discussions, support of minority candidates, academic freedom and the like cannot disguise the fact that Whitehill was asked simply to disclaim actual, present activity,

---

[1] The oath did not even include the limited sort of "membership" clause also approved in *Gerende.* See the Court's opinion, *ante,* at 55–56, 57–58.

amounting in effect to treasonable conduct. Allusions to the constitutional amending process cannot obscure the fact that this oath makes no reference to "alteration" of our form of government or to "believing in" or "being a member of" anything whatsoever. The oath itself, then, in no way violates, jeopardizes, or beclouds appellant's freedom of speech or of association. So much, indeed, the Court's opinion appears to concede.

The Court concludes, however, that the oath must be read "in connection with" certain sections of the Ober Law because, as a state matter, the authority of the Board of Regents to require an oath derives from that law. The Court does not pause to tell us what the "connection" is or to explain how it serves to invalidate the unambiguous oath required of this appellant. On the one hand, it is plain, as the Court artistically avoids conceding, that the only effect of the law on this appellant is to deny him state employment if he refuses to sign an oath which, in itself, he can have no constitutional objection to signing. On the other hand, nowhere does the Court suggest that the character of the oath itself is altered by any language in the statute authorizing the Regents to impose it. The oath does not refer to the statute [2] or otherwise incorporate it by reference. It contains no terms that are further defined in the statute. In short, the oath must be judged on its own bottom.

The only thing that does shine through the opinion of the majority is that its members do not like loyalty oaths. Believing that it is not within the province of this Court to pass upon the wisdom or unwisdom of Maryland's policy in this regard, and finding nothing *unconstitutional* about the oath tendered to this appellant, I would affirm the judgment of the court below.

---

[2] The document submitted to appellant for his signature did contain the notation customary to government documents of the authority under which it was promulgated.