**Basil E. DALACK, Plaintiff,**

v.

**VILLAGE OF TEQUESTA, FLORIDA, Defendant.**

**No. 06–80342–CIV.**

United States District Court, S.D. Florida.

May 25, 2006.

Richard B. Rosenthal of The Law Firm of Richard B. Rosenthal, P.A. Miami, FL, for Plaintiff.

Edward G. Guedes and Robert Luck of Greenberg Traurig, P.A. Miami, FL, for Defendant.

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court on Plaintiff Basil E. Dalack's Motion for

Final Summary Judgment [**DE** # 13]. The Defendant, Village of Tequesta ("the Village"), filed a response [**DE** # 18] and requested consideration of its response as a cross-motion for summary judgment. After review of the parties' written submissions and oral argument, I find that the Plaintiff's Motion for Summary Judgment should be denied and the Defendant's cross-motion for summary judgment should be granted.

## I. Facts

The relevant facts are not in dispute. Plaintiff Basil E. Dalack ("Dalack" or "Plaintiff") was elected to the Village of Tequesta Village Council earlier this year. He had previously served two terms on the Council, from 1999–2001 and 2001–2003. Dalack and two other newly-elected Councilmembers were to be sworn in on April 13, 2006.

The Village's charter requires each Councilmember to take the following oath before taking office:

> I do solemnly swear (or affirm) that I will support, protect, and defend the Constitution, and Government of the United States and of the State of Florida against all enemies, domestic and foreign, and that I will bear true faith, loyalty and allegiance to the same and that I am entitled to hold office under the Constitution, and that I will faithfully perform all the duties of the office of _____ on which I am about to enter so help me God.

Tequesta Village Charter, § 2.03. Dalack had taken this oath before each of his previous terms. However, upon reviewing the oath this time, Dalack concluded that he could not take it in good conscience because it asks him to "support...the...Government of the United States and the State of Florida." In an April 4, 2006 letter to Village Manager Michael R. Couzzo, Jr., Dalack stated that while he would happily "support, protect, and defend" the Constitution of the United States and of Florida, he does not "support" the state and federal governments because he disagrees with their policies, specifically the war in Iraq. Dalack offered to take a modified oath. He first suggested that he omit mention of the "Government" of the United States and Florida. Then he suggested that he could swear to "protect and defend" the Government, as long as he did not have to swear to "support" it. Couzzo informed Dalack that he had no power to accept the revisions, as the Charter mandates a specific oath.

On April 7, 2006, Dalack filed a complaint seeking a declaratory judgment that the Village's oath is facially unconstitutional under the First and Fourteenth Amendments of the United States Constitution.[1] His second amended complaint, filed on April 12, 2006, sought a preliminary injunction compelling the Village to keep his seat on the council open until final resolution of this case. On April 12, this Court denied his request for preliminary injunction [DE # 5].

On April 13, 2006, the other two Councilmembers were sworn in, but Dalack refused to take the oath.[2] His seat currently remains open, and the Village has appar-

---

1. Plaintiff's Motion for Summary Judgment states that his complaint was made "implicitly" pursuant to 42 U.S.C. § 1983.

2. The following day, Dalack faxed to the Village a copy of remarks he had intended to deliver at the Council meeting. He again made clear that he was ready to swear to "support, protect, and defend the Constitution

entiy not announced any plans to fill the seat.

## II. Historical Background

Oaths of allegiance date back to feudal times. *Imbrie v. Marsh,* 5 N.J.Super. 239, 68 A.2d 761, 763 (1949). At common law, every citizen owed an "obligation of fidelity and obedience...to the government under which he live[d]." *Carlisle v. United States,* 83 U.S. 147, 155–56, 16 Wall. 147, 83 U.S. 147, 155–56, 21 L.Ed. 426 (1872). According to Blackstone, a loyalty oath did not actually increase an individual's obligations; the oath merely sought to reinforce the social tie by "uniting it with religion." 1 WILLIAM BLACKSTONE, COMMENTARIES, 369.

As early as 1562, members of the English House of Commons took oaths recognizing the Queen as the supreme ruler of England both in spiritual and worldly matters. A 1609 oath required members to swear that the King was the lawful King and could not be removed by the Pope. F. MAITLAND, THE CONSTITUTIONAL HISTORY OF ENGLAND 364–66 (1961) (cited in John J. Concannon III, *The Pledge of Allegiance and the First Amendment,* 23 SUFFOLK U.L. REV. 1019, n. 8. (1989)). These oaths mixed religion and the state in a time when rulers dictated their nation's accepted religion and "equated right religious observance with good citizenship." Harold M. Hyman, TO TRY MEN'S SOULS: LOYALTY TESTS IN AMERICAN HISTORY, 1 (University of California Press 1959) ("Hyman"). Colonists settling in Virginia and Massachusetts brought similar oaths to the new world in the name of religious and political conformity. *Id.* at 15.

Around the time of the American Revolution, several of the new American states amended prior oaths of allegiance to the King to instead require their public officials to swear loyalty or allegiance to the state's constitutional government. In 1776, the New Jersey legislature required public officers to swear "I do and will bear true faith and allegiance to the government established in this State under the authority of the people." *See Imbrie,* 68 A.2d at 763. The Delaware Constitution of 1776 contained a similar oath to "bear true allegiance to the Delaware State [and] submit to its constitution and laws."[3] 4 THE FOUNDERS' CONSTITUTION, Article 6, Clause 3, Document 2 (Philip B. Kurland & Ralph Lerner eds., 2000) ("Founders' Constitution") (internal citation omitted). Vermont's 1777 Constitution contained an oath of "fidelity and allegiance." *Id.* at Document 3. Its current Constitution retains a pledge not to "do any act or thing injurious to the Constitution *or Government* [of Vermont]." VT. CONST., ch. II, sec. 56 (emphasis added). Since 1780, the Massachu-

---

of the United States and of Florida" and that he would swear to "protect and defend the Governments of the United States and Florida." However, he said he was not "ready to give the Governments of the United States and of Florida blanket approval of their policies by swearing to support those Governments." He then proposed another alternative oath that he was willing to take, which included swearing to "respect the general republican structure of government."

Although his memorandum of law implies that the "protect and defend...the Govern-

ment" and "bear true faith, loyalty, and allegiance to [the Government]" language is constitutionally impermissible, neither his Complaint nor his comments challenge these phrases.

3. This language is not in the current Delaware Constitution. The current oath asks office holders to swear to "uphold and defend" the "Constitutions of my Country and my State." DEL. CONST. art. XIV, sec. 1.

setts Constitution has included the oath, "I, A.B., do solemnly swear, that I will bear true faith and allegiance to the Commonwealth of Massachusetts, and will support the Constitution thereof."[4] Founders' Constitution, at Document 4. By 1778, each state had a loyalty oath, and the Continental Congress authorized an oath for military and civilian officers swearing loyalty to a free America and denying allegiance to King George. Hyman, at 82. Indeed, founders George Washington and Thomas Jefferson agreed that only those willing to swear loyalty to American independence should enjoy the "full rights" of citizenship. *Id.* at 85.

Florida's original Constitution, ratified in 1838, contained an oath for members of the state legislature to "preserve, protect, and defend the Constitution of this State and of the United States." FLA. CONST. of 1838, art. VI, sec. 11 (*available at:* http://www.florida memory.com). After the Civil War, Florida enacted a new Constitution in order to rejoin the Union. The new Constitution required state legislators to take an oath identical to the one at issue here, including the promise to "support, protect, and defend the Constitution *and government* of the United States, and of the State of Florida." FLA. CONST. of 1868, art. XVI., sec. 10 (*available at:* http://www.florida memory.com) (emphasis added).[5]

Of course, the United States Constitution itself mandates its own oaths. Article II, section 1, prescribes a specific oath for the President to take before assuming office:

> I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect, and defend the Constitution of the United States.

U.S. CONST., art. II, sec. 1, cl. 8. Article VI mandates that Representatives and Senators, "and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and the several States, shall be bound by oath or affirmation, to support this Constitution." *Id.*, at art. VI, cl. 3. The Framers apparently included this requirement in order to affirm the authority of the federal government and the supremacy of federal law in its enumerated areas of power. *See* THE FEDERALIST, No. 27 (Alexander Hamilton) (McLean ed. 1788). State officials were required to swear support for the Federal Constitution because they would have a critical role in effectuating the Federal Constitution and Federal laws. *Id.*, No. 44 (James Madison); Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, vol. 3 § 1839 (1833). While the oaths were not completely without controversy,[6] most of the disagreement about them centered around their religious nature rather than their demand of loyalty. *See* Founders' Constitution.

---

**4.** "A.B." represents the oath-taker's first and last names.

**5.** This oath remains in the Florida Constitution today, although it only applies to "state and county officers." FLA. CONST. art. II, sec. 5.

**6.** Noah Webster criticized the oaths of allegiance as artifacts of despotic government unnecessary in America. He noted that an oath of allegiance itself did nothing to expand an individual's obligation, since he was already under a duty of allegiance. NOAH WEBSTER, ON TEST LAWS, OATHS OF ALLEGIANCE AND ABJURATION, AND PARTIAL EXCLUSIONS FROM OFFICE (1787); Founders' Constitution, Document 9.

Similarly, George Wilson of Pennsylvania argued, at the Constitutional Convention, that oaths were "a left-handed security only. A good government did not need them, and a bad government could not or ought not be supported." Lewis D. Asper, *The Long and*

Reviewing these origins suggests that pledging support or allegiance to the Constitution or the Government have traditionally been viewed as one and the same, the Government being the manifestation of the Constitution's plan. In requiring state officers to swear to support the Constitution, Article VI was establishing loyalty and support for the federal government itself. Seventy-two years after the Constitution's enactment, President Lincoln, in his first inaugural address, used the terms Constitution and Government interchangeably. After swearing to "preserve, protect, and defend the Constitution," Lincoln addressed the Confederate rebels: "You have no oath registered to heaven to destroy the Government, while I shall have the most solemn one to 'preserve, protect, and defend it.'" *See* Robert F. Blomquist, *The Presidential Oath, The American National Interest, and A Call for Presiprudence,* UMKC L. REV. 73 1, 18 (2004) (citing Joint Congressional Committee on Inaugural Ceremonies, Inaugural Addresses of the Presidents of the United States, S. Doc. No. 101–10 (1st Sess.1989)).

### III. Case Law

The United States Supreme Court considered challenges to various "loyalty oaths" under the First and Fourteenth Amendments in a series of cases during the 1960s and 1970s. Many of the challenged oaths were enacted, or expanded, during the "Red Scare" or McCarthy eras, when fears of Communism ran high. None of these cases directly examined the phrase "support the Government" that is at issue here. However, a recitation of these cases illuminates the principles which must guide my decision.

*Unhappy History of Loyalty Testing in Maryland,* 13 AM. J. LEGAL HIST. 97, 102 (1969)

In *Cramp v. Board of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) the Court struck down a Florida statute requiring each government employee to swear that:

> I will support the Constitution of the United States and of the State of Florida; that I am not a member of the Communist Party; that I have not and will not lend my aid, support, advice, counsel or influence to the Communist Party; that I do not believe in the overthrow of the Government of the United States or of the State of Florida by force or violence; that I am not a member of any organization or party which believes in or teaches, directly or indirectly, the overthrow of the Government of the United States or of Florida by force or violence.

*Id.* at 368 U.S. at 280 n. 1, 82 S.Ct. at 277 n. 1 (citing Fla. Stat. § 876.05). The Court held that the statute was unconstitutionally vague, following the rule that "a statute which forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential due process of law." *Id.,* 368 U.S. at 287, 82 S.Ct. 275 (citing *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). The Court concluded that there was no objective way for an individual to measure whether he had lent "aid," "support," "advice," or "counsel" to the Communist party. *Cramp,* 368 U.S. at 287, 82 S.Ct. 275. For example, the Court questioned whether a journalist who had defended the constitutional rights of the Communist party could know whether he

(internal citation omitted).

had lent "support" to the Party. The Court also noted that the "vice of unconstitutional vagueness" is particularly aggravated where a statute "operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Id.*

Three years later, the Court reviewed a Washington state statute in *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). The Washington oath actually contained two components, one from a 1931 statute and one from a 1955 statute. The 1955 statute required an oath that one was not a "subversive" person. Similar to the oath in *Cramp,* the 1955 statute defined "subversive" to include committing, attempting, aiding, advocating, abetting, advising, and teaching any act to overthrow the government. *Baggett,* 377 U.S. at 363, 84 S.Ct. 1316. Again, the Court found that the definition of such conduct was impermissibly vague and that the statute criminalized "an undefined variety of guiltless behaviors." *Id.* at 366–67, 84 S.Ct. 1316.

The 1931 oath is more relevant to the instant case. That portion read:

> I solemnly swear (or affirm) that I will *support the constitution and laws* of the United States of America and of the State of Washington, and will by precept and example *promote respect for the flag and the institutions of the United States of America* and the State of Washington, reverence for law and order and *undivided allegiance to the government* of the United States.

*Id.* at 361–362, 84 S.Ct. 1316 (emphasis added). Again, the Court found portions

of this oath impermissibly vague. Specifically, the promise to "promote respect for the flag and institutions" of government swept a wide range of activities, including exercises of free speech, such as refusing to salute the flag, criticizing the state judicial system, or suggesting abolition of particular government departments. *Id.* at 371, 84 S.Ct. 1316. Similarly, the Court found it "difficult to ascertain" how one could avoid violating the promise to "promote...undivided allegiance." For instance, membership in a group critical of government policy might be considered placing loyalty to the group over loyalty to the government.[7] *Id.* at 372, 84 S.Ct. 1316.

Furthermore, the Court refused to rely on "a prosecutor's sense of fairness and the Constitution" to prevent perjury prosecutions in the Court's hypothesized situations. *Id.* at 373, 84 S.Ct. 1316. Nor would the Court wait for state courts to further interpret the statute, finding that the law's uncertainty allowed "infinite" interpretations and would require "extensive adjudications" to produce definite boundaries. *Id.* at 377–78, 84 S.Ct. 1316.

The Court next considered an Arizona oath to "support the Constitution and laws of the United States...[and] bear true faith and allegiance to the same, and defend them against all enemies" in *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). In striking down the statute, the Court did not examine the language of the oath itself; rather it took issue with the statutory "gloss" imposed by the Legislature. The "gloss" subjected a public employee to perjury if he took the oath and "knowingly and will-

---

**7.** The *Baggett* Court did not discuss, criticize, or endorse the "support the Constitution and laws" portion of the oath.

fully bec[ame] or remain[ed] a member of the communist party...or any other organization having, for one of its purposes the overthrow of the government...where the employee had knowledge of the unlawful purpose." *Id.*, 384 U.S. at 13, 86 S.Ct. 1238. The Court found this gloss overbroad because it punished mere "knowing" membership in an organization without the "specific intent" to further the organization's illegal purpose. *Id.* at 17, 86 S.Ct. 1238. Thus, the statute was not "narrowly drawn to define and punish specific conduct" without threatening freedom of association. *Id.* at 18, 86 S.Ct. 1238. *See also, Whitehill v. Elkins,* 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

During this same period of time, the Court held other oaths to be Constitutional. For example, in *Bond v. Floyd,* the Court upheld an oath to "support the Constitution of this State and of the United States." 385 U.S. 116, 129, 87 S.Ct. 339, 346, 17 L.Ed.2d 235 (1966) (quoting GA. CONST., art. 3, s. 4). Civil rights leader Julian Bond had been elected to the Georgia Legislature. He was willing to take the oath of office, but the Legislature prevented him from doing so because he had strongly criticized the war in Vietnam and the draft. The Legislature concluded that his remarks showed that "he does not and will not support the Constitutions" and that he "gives aid and comfort to the enemies of the United States." *Id.*, 384 U.S. at 125, 86 S.Ct. 1306. The Court held that

an oath to "support the Constitution" does not violate the First Amendment, and that a legislator who takes such an oath enjoys as broad First Amendment freedom as any private citizen. While the State has "an interest in requiring its legislators to swear a belief in the constitutional processes of government, surely the oath gives it no interest in limiting its legislators' capacity to discuss their views of local or national policy." *Id.* at 135, 86 S.Ct. 1306.

■ Between 1968 and 1970, the Supreme Court affirmed, per curiam,[8] three district court panel[9] opinions which had upheld general affirmative oaths similar to the one presented in this case. In *Knight v. Board of Regents,* 269 F.Supp. 339 (S.D.N.Y.1967) (*aff'd,* 390 U.S. 36, 88 S.Ct. 816, 19 L.Ed.2d 812 (1968)), the Court rejected a challenge to a New York oath for teachers to "support the constitution [sic] of the United States and the constitution [sic] of the state of New York." The *Knight* plaintiffs argued that the oath was "void for vagueness," relying on *Baggett, Keyishian, Elfbrandt,* and *Cramp.* However, the Court found that those "negative loyalty oath" cases presented a "very different problem" from the New York oath. *Id.*, 269 F.Supp. at 341. The Court found that the "support the constitution" language was "simple and clear in its import." *Id.* "The statutory language of support of the constitutional *governments* can be substantially equated to the allegiance which, by the common law, every citizen was understood to owe his sovereign." *Id.* (citing

**8.** Votes by the Supreme Court to affirm a case summarily are decisions on the merits of the case. These decisions remain binding until the Supreme Court instructs otherwise. *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975).

**9.** All three cases were heard by three-judge panels of the District Court pursuant to 28 U.S.C. § 2281. That statute required a three-judge district court to hear all applications for a permanent injunction restraining enforcement of a state statute on grounds of unconstitutionality. The statute was repealed in 1976.

1 BLACKSTONE'S COMMENTARIES (Fifth Edition) 369) (emphasis added). The Court interpreted the statute as imposing no restrictions on political speech, finding that "[a] state does not interfere with its teachers by requiring them to support the government systems which shelter and nourish the institutions in which they teach." *Id.* at 341–42.

The oath in *Hosack v. Smiley*, 276 F.Supp. 876 (D.Colo.1967) (*aff'd*, 390 U.S. 744, 88 S.Ct. 1442, 20 L.Ed.2d 275 (1968)), went one step further, requiring teachers to "support the Constitution *and laws* of the United States and the Constitution and laws of the State of Colorado." (emphasis added). The *Hosack* Court also rejected arguments that the oath violated the First Amendment and was too vague. Considering the vagueness test employed in *Cramp*, the Court found the Colorado oath "plain, straight-forward, and unequivocal," requiring only recognition that "ours is a government of laws and not of men." *Id.* at 878.

> Recognition and respect for law in no way prevents the right to dissent and question repugnant laws. Nor does it limit the right to seek through lawful means the repeal or amendment of state or federal laws with which the oath taker is in disagreement. Support for the constitutions and laws of the nation and state does not call for blind subservience. Such an extreme concept is not now nor has it ever been accepted.

*Id.* at 879. *See also Ohlson v. Phillips,* 304 F.Supp. 1152 (D.Colo.1969) (*aff'd,* 397 U.S. 317, 90 S.Ct. 1124(Mem), 25 L.Ed.2d 337 (1970)) (approving an oath to "*uphold* the constitution of the United States and of the State of Colorado" (emphasis added)).

After *Knight, Hosack, and Ohlson,* it is clear that oaths to "support the Constitution" are constitutional. Although following this general rule in *Law Students Civil Rights Research Council, Inc., et al. v. Wadmond,* 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971), the Supreme Court questioned a New York rule requiring the committee reviewing state bar applicants to certify that an applicant "believes in the form of the government of the United States and is loyal to such government." *Id.,* 401 U.S. at 161, 91 S.Ct. 720. In dicta, the Court commented that this language "lends itself to a construction that could raise substantial constitutional questions...as to the permissible scope of inquiry into an applicant's political beliefs under the First and Fourteenth Amendments." *Id.* at 162, 91 S.Ct. 720. Ultimately, the Court upheld the rule because the state authorities entrusted with interpreting the rule had determined that "the form of the government of the United States" and "the government" refer solely to the Constitution. *Id.* at 163, 91 S.Ct. 720. Furthermore, the state had interpreted "belief" and "loyalty" to mean "no more than willingness to take the constitutional oath and ability to do so in good faith." *Id.* Deferring to the state's construction, the Court found no constitutional infirmity. *Id.*

The Court continued its examination of general oaths in *Cole v. Richardson,* 405 U.S. 676, 92 S.Ct. 1332, 31 L.Ed.2d 593 (1972). In *Cole,* a Massachusetts state employee challenged the state's oath:

> I do solemnly swear that I will *uphold and defend* the Constitution of the United States of America and the Constitution of the Commonwealth of Massachusetts and that I will *oppose* the overthrow of the government of the United States of America or of this Commonwealth by force, violence, or by any illegal or unconstitutional method.

*Id.,* 405 U.S. at 677, 92 S.Ct. 1332 (citing Mass. Gen. Laws, c. 264, § 14) (emphasis added). The lower court had upheld the oath's "uphold and defend the Constitution" clause, following *Knight, Wadmond,* and *Ohlson,* but had found the "oppose the overthrow of the government" clause vague because it raised "undefinable responsibilities to actively combat a potential overthrow of the government." *Cole,* 405 U.S. at 683, 92 S.Ct. 1332.

In *Cole,* the Supreme Court began its analysis by reviewing some of the major principles from the previous decade of loyalty oath cases. The government may not condition employment on taking an oath that one has not or will not engage in protected speech, such as criticizing government policy or discussing political doctrine. *Id.* at 680, 92 S.Ct. 1332. Second, an oath cannot be so vague that ordinary people would guess at its meaning and be chilled from engaging in protected activity. *Id.* at 681, 92 S.Ct. 1332. However, the Court then noted a previously unarticulated distinction between oaths that required individuals to look back at past activities and put the government in a censorial posture of approving political viewpoints and oaths that promise future "constitutional support in broad terms." *Id.* Although the First Amendment could theoretically have invalidated oaths to "support the Constitution," the Court's decision to read these oaths as "an acknowledgment of a willingness to abide by constitutional processes of government" did not conflict with its prior decisions striking down other oaths. *Id.* at 682, 92 S.Ct. 1332.

Turning to the lower court's ruling on the Massachusetts oath, the Supreme Court disapproved of that court's "highly literalistic approach" to the "oppose the overthrow" clause. *Id.* at 683, 92 S.Ct.

1332. While a literal interpretation of "oppose the overthrow" would raise vagueness concerns over exactly what actions the oath-taker was obligated to take, such a literal approach was "inconsistent with the Court's approach to 'support' oaths." *Id.* Rather, the Court had recognized that legislatures enacted "support" oaths "not to create specific responsibilities but to assure that those in positions of public trust were willing to commit themselves to live by the constitutional processes of our system." *Id.* at 684, 92 S.Ct. 1332. Thus, just as the "connotatively active word 'support'" did not actually impose affirmative duties on oath-takers, the words "uphold," "defend," and "oppose" in the Massachusetts oath merely represented a willingness to make the same commitment to abide by the Constitutional system, not obligations to specific action. *Id.*

After *Cole,* the Supreme Court decided one more oath case, *Communist Party of Indiana v. Whitcomb,* 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974). In *Whitcomb,* an Indiana statute denied candidates ballot access unless their political party filed an affidavit swearing that the party does not "advocate the overthrow of the local, state, or national government by force or violence." As the Court previously held in *Keyishian,* and at least implied in *Cramp* and *Elfbrandt,* an oath cannot forbid or proscribe advocacy of a doctrine, divorced from any direct incitement of lawless behavior. *See also Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Unlike general "support" oaths, like the one in *Cole,* this oath directly infringed on expressive rights, and the Court struck it down. *Whitcomb,* 414 U.S. at 448–50, 94 S.Ct. 656.

The former Fifth Circuit addressed and struck down another loyalty oath in *Social-*

*ist Workers Party v. Hill,* 483 F.2d 554 (5th Cir.1973).[10] To appear on the Texas state ballot, a candidate had to swear:

> I believe in and approve of our present representative form of government, and, if elected, I will support and defend our present representative form of government and will resist any effort or movement from any source which seeks to subvert or destroy the same or any part thereof, and I will support and defend the Constitution and laws of the United States and of the State of Texas.

*Id.* at 555 (citing Tx. Election Code, § 6.02). The legislative proviso immediately following the oath "made abundantly plain" the legislature's meaning of "present representative form of government" by barring candidates from the Communist, Nazi, and Fascist parties, or any other party with the purpose of replacing representative government. *Id.* at 557. Viewing the oath in light of the latter provision, the Court found that the oath infringed on First Amendment rights by conditioning elective office on a candidate's willingness to forswear his political beliefs. *Id.*

Finally, *Gough v. State,* 285 N.J.Super. 516, 667 A.2d 1057 (1995), is the most recent case to have considered all of the above precedents. While that Court's decision is not binding on this Court, it is worth noting how another court synthesized the same set of decisions. A New Jersey statute required public school teachers to sign an oath that:

> I will support the Constitution of the United States and the Constitution of the State of New Jersey, and that I will *bear true faith and allegiance* to the same and *to the Governments* estab-

*lished in the United States and in this State,* under the authority of the people.

*Id.* at 1058 (citing N.J. Stat. 41:1–1) (emphasis added). The appellant, like Dalack, argued that the promise to "bear true faith and allegiance...to the Governments" was ambiguous and would eliminate his right to disagree with the government.

After reviewing the history of loyalty oaths in New Jersey back through colonial times, and considering *Keyishian, Cole, Elfbrandt, Baggett, Whitehill, Hosack,* and *Hill,* the Court upheld the oath. The Court found that, in simply requiring support for the state and federal Constitutions and allegiance to the Government, the oath did not "qualif[y] any of the political or personal freedoms granted in the Bill of Rights." *Gough,* 667 A.2d at 1069. Finding the New Jersey oath "much like" the oath to support the Constitution and laws of Colorado, the Court agreed with *Hosack* that "recognition and respect for the law in no way prevents the right to dissent and question repugnant laws." *Id.* The Court also stated that the New Jersey oath did not have the "invidious character" of *Baggett's* oath to "promote respect for the flag...and institutions of government." *Id.* Finally, the Court drew support from the fact that the allegiance clause in question stretched back to 1776 and had survived both time and "many political tides." *Id.* at 1070.

## IV. Analysis

In this case, Dalack argues alternatively that the Village's oath is unconstitutionally vague or impermissibly infringes upon his First Amendment right of free speech.

██ The case law makes clear that the government cannot condition employment

---

**10.** Rulings from the old Fifth Circuit are binding precedent in the Eleventh Circuit. *Bon-*

*ner v. City of Prichard, Alabama,* 661 F.2d 1206 (11th Cir.1981).

or elective office on taking an oath that impinges on First Amendment rights, such as those guaranteeing freedom of political beliefs. *Cole,* 405 U.S. at 680, 92 S.Ct. 1332; *Wadmond,* 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749. Nor can an oath require denial of past or future associational activity or advocacy of political doctrine. *Keyishian,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629; *Cramp,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285; *Whitehill,* 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228; *Elfbrandt,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321. Furthermore, an oath cannot be so vague that "men of common intelligence must necessarily guess at its meaning." *Cramp,* 368 U.S. at 287, 82 S.Ct. 275; *Baggett,* 377 U.S. at 367, 84 S.Ct. 1316.

However, it is also clear that oaths to "support the Constitution" or even to "support the Constitution *and laws* " of the United States and of a particular state are not vague and do not impinge on freedom of belief, association, or advocacy. *Bond,* 385 U.S. at 132, 87 S.Ct. 339; *Knight,* 269 F.Supp. at 341 (*aff'd,* 390 U.S. 36, 88 S.Ct. 816, 19 L.Ed.2d 812); *Hosack,* 276 F.Supp. at 878–879 (*aff'd,* 390 U.S. 744, 88 S.Ct. 1442, 20 L.Ed.2d 275). The decision in *Bond* makes clear that an oath to "support the Constitution" does not, and cannot, prevent a legislator from criticizing a war. 385 U.S. at 135, 87 S.Ct. 339. Finally, words like "support," "defend," "uphold," and "oppose" in general support oaths are not vague because they are not meant to impose specific actions and responsibilities on the oath-taker. *Cole,* 405 U.S. at 684, 92 S.Ct. 1332.

Thus, the Plaintiff's ultimate burden here is to demonstrate why an oath to "support the *Government* " is vague or violative of the First Amendment when oaths to "support the *Constitution* and *laws* " are not.

## A. Vagueness

■ Dalack primarily argues that the oath to "support...the Government" is vague. He admits that one could interpret the phrase as merely requiring a commitment to conduct his official duties within the bounds of the law and the Constitution's republican processes. However, he argues that one could also reasonably interpret the phrase as commanding agreement with, and allegiance to, the current administrations of President George W. Bush and Governor Jeb Bush. Indeed, he argues that most ordinary citizens would choose the latter interpretation. Seeing two "reasonable" interpretations, one of which would clearly infringe on freedom of speech and chill political dissent, Dalack concludes that "men of ordinary intelligence must necessarily guess at its meaning and differ as to its application."

However, viewing the oath through the interpretive lens articulated in *Cole, Knight, Hosack,* and *Ohlson,* I find that the oath is not unconstitutionally vague. As described in *Cramp* and *Baggett,* the vice of vagueness appears when a statute imposes specific obligations to act or refrain from acting in a particular way without sufficiently identifying where those obligations end. However, *Cole* makes clear that, when examining general "support" oaths, courts should not interpret terms like "support," "uphold," "defend," or "oppose" as literally imposing any specific responsibilities for action. 405 U.S. at 683–84, 92 S.Ct. 1332. The "negative loyalty oaths" in *Cramp, Baggett,* and *Whitehill* used so many all-encompassing terms to describe prohibited activities that the universe of banned behavior seemed infinite.

But *Cole* authoritatively defined "support," in the context of a general, forward-looking oath, as simply "a commitment to abide by our constitutional system." 405 U.S. at 684, 92 S.Ct. 1332.

Dalack argues that the ambiguity of the word "Government" distinguishes this case from *Cole* and renders the oath unconstitutionally vague. "Government," according to Dalack, can mean the specific leaders and their policies as easily as it can mean the institutions or form of government. Dalack further argues that the very existence of this ambiguity is fatal, regardless of how the Court would interpret "Government," as the vagueness doctrine is meant to confront situations where ordinary citizens cannot definitively know the meaning of the law.

However, if I were to accept Dalack's view, the vagueness doctrine would swallow all of judicial interpretation. As Justice Harlan said, "Almost any word or phrase may be rendered vague and ambiguous by dissection with a semantic scalpel." *Cole*, 405 U.S. at 684, 92 S.Ct. 1332 (citing the Court's previous consideration of the same case, 397 U.S. 238, 240, 90 S.Ct. 1099, 25 L.Ed.2d 275 (1970) (Harlan, J. concurring)). A (perhaps *the*) central role of courts is to interpret the law when the language itself could yield multiple reasonable meanings. Dalack's assertion that a vagueness challenge eliminates the Court's ability to interpret language in a constitutionally permissible way is simply wrong. "Where the constitutional requirement of definiteness is at stake, we have the further obligation to construe the statute, if that can be done consistent with the legislature's purpose, to avoid the shoals of vagueness." *Buckley v. Valeo*, 424 U.S. 1, 77–78, 96 S.Ct. 612, 662–63, 46 L.Ed.2d 659 (1976).

In the context of the Village's oath, "Government" cannot refer specifically to the current administration or individual elected leaders. The history of similar oaths, as discussed above, suggests that the oath is an expression of the common law allegiance owed to a sovereign. In this country, where administrations and individual leaders change routinely, the sovereign "Government" means the institutions and republican structure that are the manifestations of the Constitution itself, deriving their authority from the consent of the people.

In fact, it makes little sense to ascribe a single voice to "the Government." The basic principles of federalism and separation of powers virtually guarantee that "the Government" will consist of myriad clashing voices. The First Amendment itself, in some views, is a structural provision meant to guarantee that "the Government" embraces multiple viewpoints. *See* Akhil Reed Amar, *The Bill of Rights As A Constitution*, 100 YALE L.J. 1131, 1147 (1991). In other words, "the Government" includes both President George W. Bush, proponent of the war in Iraq, and Representative John Murtha, an outspoken critic of that war. Interpreting "Government" as the individual leaders or their policies would render the entire oath nonsensical any time, say, the Governor of Florida and the President of the United States disagree or when the administration changes.[11]

---

11. The Plaintiff also argues that "Constitution" and "Government" must have separate meanings because the oath's writers chose to include both terms. However, as the Supreme Court noted in *Cole*, repetition "whether for emphasis or cadence, seems to be the wont of authors of oaths." 405 U.S. at 684, 92 S.Ct. 1332.

Having interpreted the words "support" and "Government," the phrase "support the Government" in the Village's oath is only a recognition of the legitimacy of our Constitutional institutions and a commitment to conduct one's public duties within the law and the Constitution's republican structure. This interpretation is consistent with the theory behind *Cole, Knight, Hosack,* and *Ohlson.* Dalack argues that the noun "Government" turns the phrase "support the Government" into a command to agree with policies (or at least that it raises the specter of such a command). However, one could make the same argument about the nouns "Constitution" and "laws." "The Constitution" and "the laws" are, at heart, a set of values, precepts, and policies, all of which represent specific choices. Yet in upholding the general "support" oaths in *Cole, Knight, Hosack,* and *Ohlson,* the Supreme Court chose not to interpret "support the Constitution" or "support the laws" as commands to agree with the policies and choices those nouns represent. Instead, the oaths only meant a recognition of the authority and legitimacy of those choices. It is difficult to see why the same interpretation would not apply here.

The Village's oath is distinguishable from the oath struck down as vague in *Baggett.* That oath required one to *"promote respect* for the flag and the institutions of the United States of America and

the State of Washington . . . and undivided allegiance to the government of the United States." 377 U.S. at 361–62, 84 S.Ct. 1316 (emphasis added). Whereas one fulfills the duty to "support," as defined in *Cole,* by abiding by the constitutional system, the duties to "promote respect" and "promote undivided allegiance" are decidedly more active and potentially require actual advocacy against one's beliefs.[12]

**B. Constitutionality of the Oath as Interpreted by the Court**

 The Plaintiff further argues that, even as interpreted by the Court, the oath to "support the Government" still violates the First Amendment by proscribing beliefs.

The promise to "support the Government" does not force the Plaintiff to agree with administration policies nor prevent him from advocating change. As the Court stated in *Hosack:*

> Recognition and respect for law in no way prevents the right to dissent and question repugnant laws. Nor does it limit the right to seek through lawful means the repeal or amendment of state or federal laws with which the oath taker is in disagreement. Support for the constitutions and laws of the nation and state does not call for blind subservience.

276 F.Supp. at 879. Admittedly, the oath in question in that case was to "support

---

**12.** The Plaintiff opposes using *Cole* as an interpretive lens, arguing that if *Cole* allowed courts to interpret around "vagueness," then the post-*Cole* cases *Hill,* 483 F.2d 554 and *Whitcomb,* 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635, would have been decided differently. The Plaintiff, however, misconstrues the holdings in *Hill* and *Whitcomb.* In *Hill,* the Constitutional infirmity was not vagueness. Rather the statute supplying additional meaning to the oath directly infringed on

political beliefs by explicitly barring certain groups and ideologies from the ballot. 483 F.2d at 557. The problem in *Whitcomb* was overbreadth-the statute specifically attacked "advocacy," which could not be defined without incorporating protected speech. 414 U.S. at 448–450, 94 S.Ct. 656. As discussed below, the Village's oath is distinguishable because, as interpreted, it does not preclude or punish particular ideas or advocacy.

the Constitution and laws," not the "Government." However, there is no reason why the same sentiments and logic do not apply to supporting the Government. Dalack tries to distinguish the clearly permissible oath to "support the Constitution" and the challenged oath to "support the Government," by pointing to Article V's amendment procedure. He asserts that one who wanted to abolish the Federal government and return all power to the states could still "support the Constitution" by proposing the change through Article V's amendment procedure. This hypothetical individual, Dalack argues, would be supporting the Constitution but certainly would not be supporting the Government by trying to abolish it. However, Dalack's hypothetical demonstrates how one can disagree with policy and still "support" the institution.

If one disagrees with the substance of the Constitution-be it the equal protection clause, the right to bear arms, or the structure of the Government itself-one can still "support the Constitution" while seeking to change it through the established amendment procedure. Dalack's hypothetical admits this much. By the same token, one can disagree with the policies of the Government but continue to "support" its authority and republican structure by working to change policies through established, legitimate, and lawful means. In other words, "support" does not mean "blind subservience," whether one is referring to "the Constitution," "the laws," or "the Government."

Finally, the Plaintiff argues that even interpreting "Government" to mean the republican structure and institutional manifestations of the Constitution makes an oath to "support the Government" an impermissible establishment of political or-

thodoxy. He points to *Hill*, where the former Fifth Circuit struck an oath swearing "I believe in and approve of our present representative form of government, and, if elected, I will support and defend our present representative form of government. . . ." 483 F.2d at 555. However, *Hill* is distinguishable. First, just as the Arizona and Maryland legislatures put impermissible "glosses" on otherwise legitimate oaths in *Elbrandt* and *Whitehill*, respectively, the Texas legislature made clear that the oath in *Hill* was meant to exclude holders of particular ideologies from elective office, specifically members of the Communist, Nazi, and Fascist parties. This statutorily-provided "gloss" was central to the *Hill* decision. *See* 483 F.2d at 557. Here, there is no such reason to believe that the oath precludes particular political beliefs.

Furthermore, the oath in *Hill* pledged not just "support" for representative government, but *approval of* and *belief in* that form of government. The added verbs of "believe" and "approve" actually dictate the oath-taker's thoughts and impermissibly censor his past and future advocacy. But the oath to "support," interpreted as a willingness to "abide" in *Cole*, does not dictate the individual's beliefs. One can agree to abide by the Government's republican structure even if one believes it should be changed. Under the Village's oath, someone who advocates amending the Constitution to, say, repeal the First Amendment or remove Article IV's "republican form of government" clause, may propose an amendment through Article V or run for office and attempt to amass electoral support for his ideas. He must simply recognize that the only legitimate way to change the republican structure is to advocate his change through that structure, rather than circumventing the Con-

stitution and laws through violent take-over. This difference also distinguishes *Wadmond*, where New York's statute asked for proof of *belief* in our form of government, 401 U.S. at 161, 91 S.Ct. 720, and cases such as *Keyishian*, *Elfbrandt*, *Whitehill*, and *Whitcomb*, where the statutes punished mere advocacy or association with particular doctrines.[13]

### V. Conclusion

It is clear that requiring an individual to swear agreement with particular government policies or leaders as a condition of taking office would violate the First and Fourteenth Amendments. Indeed, any loyalty oath scheme presents the opportunity for abuse, particularly in wartime. Any attempt to interpret the Village's oath as requiring such blind allegiance, or any attempt to prosecute for perjury Mr. Dalack or any other official for disagreeing with federal, state, or local policies, would be constitutionally impermissible. As recognized in *Cole* any such action would not proceed "while this Court sits." 405 U.S. at 686, 92 S.Ct. 1332 (quoting *Panhandle Oil Co. v. State of Miss. ex rel. Knox*, 277 U.S. 218, 223, 48 S.Ct. 451, 72 L.Ed. 857 (Holmes, J. dissenting)). The Village's oath, however, does not compel such political agreement or require Mr. Dalack or any other individual to forswear his beliefs. Therefore, it is

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Final Summary Judgment [**DE # 13**] is **DENIED**. Defendant's cross-motion for Summary Judgment [**DE # 18**] is **GRANTED**. The Court will enter final judgment for the Defendant in a separate order.

---

13. The same distinction applies to two additional cases cited by the Plaintiff: *Shapiro v. Roudebush*, 413 F.Supp. 1177 (D.Mass.1976) and *Socialist Workers Party v. Hardy*, 480 F.Supp. 941 (E.D.La.1977). Both of these cases involved oaths regarding mere membership in the Communist Party, and/or belief and advocacy of the Communist doctrine. These cases fall squarely within the *Cramp*, *Elfbrandt*, *Keyishian*, *Whitehill*, and *Whitcomb* line of cases, rather than those addressing general, positive "support" oaths.